## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JUDICIAL WATCH, INC.,<br><br>          Plaintiff,<br><br>v.<br><br>MURIEL BOWSER, *et al.*,<br><br>          Defendants. | Civil Action No. 20-01789 (TSC) |

## DEFENDANTS' MOTION TO
## DISMISS PLAINTIFF'S COMPLAINT

Defendants Mayor Muriel Bowser, John Falcicchio (Acting Deputy Mayor for Planning and Economic Development) and Jeffrey Marootian (Director of the District Department of Transportation) (collectively, the District), move to dismiss plaintiff's Complaint with prejudice. Fed. R. Civ. P. 12(b)(6).

As set forth in the accompanying memorandum of points and authorities, dismissal is appropriate because plaintiff has failed to state a violation under the First Amendment. Plaintiff challenges the District's failure to grant its request to paint the motto "Because No One Is Above the Law!" on a city street, alleging that the "Black Lives Matter" and "Defund the Police" murals on 16th Street turned the streets into a forum for public expression, and that the denial of plaintiff's request to paint a mural constitutes impermissible viewpoint discrimination. But the District's selection of art to display in public places is a form of government speech that is not subject to First Amendment scrutiny. And even if the District did create a forum for

public expression, it has not engaged in viewpoint discrimination by denying plaintiff's request for a permit to paint a mural on a District street because no such permit exists. Moreover, plaintiff cannot establish municipal liability under 42 U.S.C. § 1983, because the Complaint fails to identify any official policy or custom that led to the purported constitutional violation, let alone that any such policy or custom caused the alleged injury. A proposed order is attached.

Dated:  July 27, 2020.                    Respectfully submitted,

                                          KARL A. RACINE
                                          Attorney General for the District of Columbia

                                          TONI MICHELLE JACKSON
                                          Deputy Attorney General
                                          Public Interest Division

                                          /s/ Fernando Amarillas
                                          FERNANDO AMARILLAS [974858]
                                          Chief, Equity Section

                                          /s/ Pamela A. Disney
                                          PAMELA A. DISNEY [1601225]
                                          GAVIN N. PALMER [1619264]
                                          Assistant Attorneys General
                                          441 Fourth Street, N.W., Suite 630 South
                                          Washington, D.C.  20001
                                          (202) 807-0371
                                          pamela.disney@dc.gov

                                          Counsel for Defendants

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JUDICIAL WATCH, INC., | |
| Plaintiff, | |
| v. | Civil Action No. 20-01789 (TSC) |
| MURIEL BOWSER, *et al.*, | |
| Defendants. | |

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT

INTRODUCTION

Plaintiff Judicial Watch, Inc.'s challenge to the District of Columbia's (the District)[1] failure to grant its request to paint the motto "Because No One Is Above the Law!" on a city street should be dismissed for failure to state a claim for relief. Plaintiff's claim rests on the faulty assumption that the "Black Lives Matter" and "Defund the Police" murals recently painted on 16th Street turned city streets into a forum for public expression, and that the denial of plaintiff's request to paint a similar mural constitutes impermissible viewpoint discrimination under the First Amendment. The Complaint fails to state a plausible claim for relief under the First

---

[1] Defendants, sued in their official capacities, are Mayor Muriel E. Bowser, John Falcicchio (Acting Deputy Mayor for Planning and Economic Development) and Jeffrey Marootian (Director of the District Department of Transportation). Defendants are collectively referred to as "the District."

Amendment and, even if it did plaintiff cannot show that the alleged constitutional violation was attributable to the District.

Under the well-established government speech doctrine, the District's selection of art to display in public places is a form of government expression that is not subject to First Amendment scrutiny. Even if it were difficult to determine whether the District engaged in its own speech or created a forum for public expression in the circumstances presented here, the Court should find that the murals on 16th Street are protected government speech based on the factors the Supreme Court considers to resolve close cases—namely, "(1) whether the medium at issue has historically been used to communicate messages from the government; (2) whether the public reasonably interprets the government to be the speaker; and (3) whether the government maintains editorial control over the speech." Moreover, although inapplicable in this case, a forum analysis would show that the District has not created a traditional forum, limited or designated forum, or nonpublic forum on its streets. And even if the District did create a forum, it did not discriminate on the basis of viewpoint by failing to grant plaintiff a permit to paint a mural on a city street because no such permit exists.

Finally, even assuming plaintiff has stated a plausible claim for relief under the First Amendment, plaintiff cannot establish municipal liability under 42 U.S.C. § 1983 (Section 1983), because it has not alleged that the purported violation was attributable to the District, and fails to identify any official policy or custom that led to the alleged injury. The Court should grant the District's motion to dismiss.

# BACKGROUND

## I.    The District's Street Murals

On June 1, 2020, protesters descended upon the District of Columbia—and cities across the Nation—to express their concerns about the deaths of George Floyd and other unarmed African Americans during interactions with law enforcement. *See, e.g.*, Dalton Bennett, *et al.*, *The crackdown before Trump's photo op: How law enforcement cleared protesters outside the White House*, Wash. Post. (June 8, 2020), *available at* https://www.washingtonpost.com/investigations/2020/06/08/timeline-trump-church-photo-op/. At approximately 6:30 p.m. that same evening, before the 7:00 p.m. curfew went into effect, federal law enforcement officers cleared Lafayette Square so that President Trump could walk across 16th Street from the White House to St. John's Episcopal Church for a photo opportunity. *Id.* To accomplish this, the federal law enforcement officers deployed tear gas, rubber bullets and flash canisters in an effort to move the peaceful protesters who were present on the street. Prior to walking across Lafayette Square, President Trump gave a statement in the Rose Garden of the White House and expressed his intention to "dominate the streets" through use of military force. *Statement by the President*, www.whitehouse.gov (June 1, 2020), *available at* https://www.whitehouse.gov/briefings-statements/statement-by-the-president-39/.

In response to these incidents, at Mayor Bowser's direction, the Black Lives Matter mural was commissioned by the D.C. Department of Public Works (DPW) and painted in large yellow letters on a two-block stretch of 16th Street by artists from

MuralsDC, a program within DPW. *See Black Lives Matter, MuralsDC, and the Making of History,* MuralsDC, *available at* https://muralsdcproject.com/black-lives-matter-muralsdc-the-making-of-history/.[2] Led by a group of local muralists from MuralsDC, artists, DPW employees and community members painted the Black Lives Matter mural on June 5, 2020. *Id.* The two-block stretch of 16th Street where the mural was painted has been closed to traffic since the time of painting. Compl. ¶ 13.

City officials have stated that the mural was commissioned to honor the protestors advocating for changes to law enforcement practices in the wake of George Floyd's death, and to honor the peaceful protestors who were the victims of aggression by federal law enforcement on June 1, 2020. Fenit Nirappil, *et al.,* *'Black Lives Matter': in Giant Yellow Letters, D.C. Mayor Sends Message to Trump* (June 5, 2020), *available at* https://www.washingtonpost.com/local/dc-politics/bowser-black-lives-matter-street/2020/06/05/eb44ff4a-a733-11ea-bb20-ebf0921f3bbd_story.html. When asked about the District's plans for how long the Black Lives Matter mural would

---

[2]    MuralsDC has commissioned dozens of murals throughout the District, on both public and private property, that are designed to reflect the character of the community. *See Our Mission*, MuralsDC Project, *available at* http://muralsdcproject.com/our-mission/. Examples include a mural at 2nd and D Streets N.W. next to the Creative Center for Nonviolence entitled "Homeless Lives Matter," *Homeless Lives Matter*, MuralsDC Project, *available at* http://muralsdcproject.com/mural/homeless-lives-matter/, a mural bearing the words "Language Access for all in DC" on MacFarland Middle School on 13th Street, N.W., *Language Access For All in DC*, MuralsDC Project, *available at* http://muralsdcproject.com/mural/language-access-for-all-in-dc/, and a mural depicting members of the armed forces on the outside of a liquor store on Rhode Island Avenue, N.E. entitled "Support Our Troops," *Support Our Troops*, MuralsDC Project, *available at* http://muralsdcproject.com/mural/support-our-troops/.

remain painted on the street, Mayor Bowser stated: "Like all of our other public art, it stays." Michael O'Connell, *Black Lives Matter to Stay; Defund the Police Uncertain,* MSN (June 8, 2020), *available at* https://www.msn.com/en-us/news/us/black-lives-matter-mural-to-stay-defund-the-police-uncertain/ar-BB15cMre. The Mayor added that the District will "continue to talk about ways to make [the mural] part of the fabric of D.C." and she expressed an interest in involving District residents in those discussions. *Id.* Mayor Bowser has also referred to the Black Lives Matter mural as an "affirmative piece of art." *Activists Painted Defund the Police Next to the New Black Lives Matter Mural,* NPR (June 8, 2020), *available at* https://www.npr.org/local/305/2020/06/08/872234932/activists-painted-defund-the-police-next-to-the-new-black-lives-matter-mural. The mural included an image of the District's flag. *Id.*

On June 6, 2020, activists painted over the three stars that appear at the top of the District's flag and added the words "Defund the Police" in the same color paint and typeface as "Black Lives Matter." *Id.* The effect was that the mural appeared to state "Black Lives Matter = Defund the Police." *Id.* On June 7, 2020, District employees restored the paint on the original mural, repainted the three stars and left the Defund the Police painting intact. *Id.* When asked about the Defund the Police mural, Mayor Bowser acknowledged that the addition was not part of the original mural and noted that the District is merely using "city streets for *city* art." *Id.* (emphasis added).

7

## II.   Plaintiff's Allegations

Plaintiff filed its Complaint on July 1, 2020, alleging that the District's failure to grant its request to paint the motto "Because No One Is Above the Law!" on a city street has deprived plaintiff of its rights "protected under the First Amendment to the U.S. Constitution in violation of 42 U.S.C. § 1983." Compl. ¶ 27. Specifically, plaintiff claims that through the murals on 16th Street, the District has allowed its streets to be used for expressive messages and has failed to provide a reasonable process for considering plaintiff's request to paint an expressive message on a city street. *Id.* Plaintiff seeks declaratory and injunctive relief, as well as attorney's fees and costs. *Id.* at 10-11.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw [a] reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679. "[A] complaint [does not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 557).

In evaluating a motion under Rule 12(b)(6), the Court "may consider … the facts alleged in the complaint, any documents either attached to or incorporated in the complaint, and matters of which [the Court] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997); *Laughlin v. Holder*, 923 F.Supp.2d 204, 209 (D.D.C. 2013).

## ARGUMENT

I.  **Plaintiff Has Failed To State a Claim Under the First Amendment Because the District Has Not Created a Public, Limited or Nonpublic Forum for Street Paintings, And the District Has Not Engaged in Viewpoint Discrimination.**

Plaintiff alleges that the District violated the First Amendment by denying its request to paint "Because No One Is Above the Law!" on a city street. *See* Compl. ¶¶ 11, 27.[3] But plaintiff's contention that the District has turned city streets into a public forum for expressive activity through street paintings, and that plaintiff is entitled to similar access, is misguided. *Id.* Plaintiff's allegations fail to state a claim under the First Amendment for two reasons. First, the District has not created a forum for expressive activity because the Black Lives Matter and Defund the Police murals constitute government speech not subject to First Amendment scrutiny. Thus, because the District has not created a forum for expressive activity in the first instance, it is not required to accommodate plaintiff's request. Second, even if the

---

[3]    The sole count in the Complaint is styled as a claim for "Violation of 42 U.S.C. § 1983," *see* Compl. at 9, even though "Section 1983 is not itself a source of substantive rights but merely provides a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quotation omitted).

District has created a forum for expressive activity, it has not discriminated against plaintiff based on viewpoint.

A.   Art Displays on Public Property Constitute Government Speech Not Subject to First Amendment Scrutiny.

Plaintiff's claim cannot be sustained because government speech—such as the murals at issue here—is not subject to First Amendment scrutiny. Courts engage in a "'forum analysis' to evaluate government restrictions on purely private speech that occurs on government property," but such an analysis is inapplicable when the speech at issue is government speech. *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 215 (2015). "The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech." *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009).

It is well-established that the government's display of works of art is squarely within the purview of government speech and is not subject to First Amendment scrutiny. Further, "government speech includes decisions about what pieces of art it will patronize and display" on public property. *Raven v. Sajet*, 334 F. Supp. 3d 22, 30 (D.D.C. 2018), *aff'd sub nom. Raven v. United States*, Civil Action No. 18-05346, 2019 WL 2562945 (D.C. Cir. May 17, 2019); *see also Pulphus v. Ayers*, 249 F. Supp. 3d 238, 253 (D.D.C. 2017) ("The government here has therefore engaged in speech activity by 'using its editorial discretion in the selection and presentation of' the art submitted as part of the competition."); *People for the Ethical Treatment of Animals, Inc. v. Gittens*, 414 F.3d 23, 30-31 (D.C. Cir. 2005) (finding that the First Amendment's Free Speech Clause "does not apply to the government as communicator" when the

government chose which works of art to display in public spaces). The murals at issue here are works of art, and plaintiff has not pled any facts to suggest otherwise. *Activists Painted Defund the Police Next to the New Black Lives Matter Mural*, NPR (June 8, 2020) (Mayor Bowser stating that the Black Lives Matter mural is an "affirmative piece art."), *available at* https://www.npr.org/local/305/2020/06/08/872234932/activists-painted-defund-the-police-next-to-the-new-black-lives-matter-mural. In other words, the government may exercise its discretion over which pieces of art to display on public property, and plaintiff cannot plausibly refute that. *Raven*, 334 F. Supp. 3d at 30.

When it chooses artwork for public display a government is also entitled to "select the views it wants to express." *Summum*, 555 U.S. at 467. In so doing, the government does not trigger an obligation to allow other viewpoints to be similarly expressed. *Id.* "Were the Free Speech Clause interpreted otherwise, government would not work." *Walker*, 576 U.S. at 207 (rhetorically asking "[h]ow could a city government create a successful recycling program if officials, when writing householders asking them to recycle cans and bottles, had to include in the letter a long plea from the local trash disposal enterprise demanding the contrary?"). Applying a forum analysis would be inappropriate in this context, and the Court need not engage in such an analysis. *See Walker*, 576 U.S. at 215 (forum analysis is "misplaced" where the government is speaking on its own behalf); *Summum*, 555 U.S. at 480 ("[F]orum analysis simply does not apply to the installation of permanent monuments on public property.").

Indeed, in this case there can be no question that the Black Lives Matter mural constitutes government speech, as it was commissioned by the District for public display. *See Black Lives Matter, MuralsDC, and the Making of History,* MuralsDC, *available at* https://muralsdcproject.com/black-lives-matter-muralsdc-the-making-of-history/. And even though the Defund the Police mural was privately contributed, that does not mean that the display is not government speech. In an analogous case, the Supreme Court has held that privately donated monuments displayed in public spaces are also considered government speech. *Summum*, 555 U.S. at 470-71 (holding that privately donated monuments displayed in a public park are government speech). In *Summum*, the Court noted that it is "obvious" that "a monument that is commissioned and financed by a government body for placement on public land constitutes government speech," and it also found that "privately financed and donated monuments that the government accepts and displays on its land" are government speech too. *Id.* at 470. The District used the murals here to send a message to honor peaceful protestors who faced hostility on June 1, 2020, much like the many other traditional monuments that occupy public spaces throughout the District to convey a message to the public. *See* Fenit Nirappil, *et al.*, *'Black Lives Matter': in Giant Yellow Letters, D.C. Mayor Sends Message to Trump* (June 5, 2020), *available at* https://www.washingtonpost.com/local/dc-politics/bowser-black-lives-matter-street/2020/06/05/eb44ff4a-a733-11ea-bb20-ebf0921f3bbd_story.html.

That the murals were not the exclusive work of government employees similarly does not undermine the District's position that the murals are government

speech. To the extent plaintiff suggests that public participation in creating the murals supports its position that District streets are a public forum, plaintiff is mistaken. Compl. ¶ 19 (plaintiff alleges that a "team of artists, residents, district employees, and demonstrators were allowed to paint" the murals). As noted above, the Supreme Court has held that the government's display of privately created, donated or financed monuments or designs is no less government speech than if the artwork were commissioned by the government itself. *See Summum*, 555 U.S. at 470; *Walker*, 576 U.S. at 217 ("The fact that private parties take part in the design and propagation of a message does not extinguish the governmental nature of the message …"). The government's acceptance of labor, supplies, design or any other contribution from the public on the two murals is not relevant to the government speech inquiry.

Moreover, regardless of whether the District agrees with the sentiment behind the Defund the Police mural, it still constitutes government speech. "[A] city engages in expressive conduct" merely by accepting and displaying on city property a privately donated work of art. *Summum*, 555 U.S. at 446. The District does not have to formally endorse the message intended by the protesters who painted the Defund the Police mural. *Id.* at 473 (finding that the government does not have to "go through a formal process of adopting a resolution publicly embracing 'the message' that the monument convey[s]" because it "would be a pointless exercise that the Constitution does not mandate."). And the District need not intend that the mural convey *the same* message as the artists intended. *Id.* at 446 ("[T]he thoughts or sentiments expressed by a

13

government entity that accepts and displays such an object may be quite different from those of either its creator or its donor."); *id.* at 474 (noting that once artwork is displayed on government property "[a]ll rights previously possessed by the monument's donor have been relinquished"). Indeed, "text-based monuments are almost certain to evoke different thoughts and sentiments in the minds of different observers." *Id.* at 476. Here, as in *Summum*, disagreements about the message of the displays are not relevant to the government speech inquiry, nor is the message that the donor of the artwork may have intended. *Id.* at 474.

If, however, the Court finds that this case presents a "situation[] in which it is difficult to tell whether a government entity is speaking on its own behalf or is providing a forum for private speech," *Summum*, 555 U.S. at 470, the Supreme Court has established a three-part test for making that determination: "(1) whether the medium at issue has historically been used to communicate messages from the government; (2) whether the public reasonably interprets the government to be the speaker; and (3) whether the government maintains editorial control over the speech." *Pulphus*, 249 F.Supp.3d at 247 (citing *Walker*, 576 U.S. at 209-14; *Summum*, 555 U.S. at 470-72). Here, all three factors weigh in favor of the Court finding that the murals are government speech.

### 1.    District Streets Have Historically Been Used To Communicate Messages from the Government.

The first prong weighs in the District's favor because the District's markings on streets and display of public art have historically been used to convey government messages. This factor focuses not on a particular expression in a particular space;

rather, it examines the government's use of a space *generally. See Pulphus*, 249 F. Supp. 3d at 248 (applying a "higher level of generality" to the prong). In *Summum*, for example, the Supreme Court "analyz[ed] how governments have traditionally used monuments to speak to the public—not how the government has used monuments in that particular park." *Id.*; *see Summum*, 555 U.S. at 450.

Here, markings on city streets are generally intended for government communications. For example, the government may use the District streets to communicate messages regarding traffic and safety instructions. *See* 24 DCMR § 2100 (adopting the 2003 edition of the Federal Highway Administration's Manual of Uniform Traffic Control Devices and all subsequent editions as the official standard for pavement markings). District street surfaces are not traditionally places where members of the public can display permanent or long-term messages, and such use of city streets is—for safety reasons—not generally permissible. *See, e.g.*, 24 DCMR § 2102 (prohibiting anyone from displaying signs or markings that would hide or interfere with the effectiveness of traffic control devices). Plaintiff's own admission that it "was unable to identify or recall any similar use of District street surfaces for painting expressive messages," Compl. ¶ 12, further supports the District's position that streets are not generally used for the expressive purpose plaintiff seeks. And the Supreme Court has held that it would not infer that the government intended to create a public forum "when the nature of the property is inconsistent with expressive activity." *Cornelius*, 473 U.S. at 803.

Moreover, government display of art is also a traditional means of communicating a message. As the Supreme Court noted in *Summum*, "[g]overnments have long used monuments to speak to the public" and "[w]hen a government entity arranges for the construction of a monument, it does so because it wishes to convey some thought or instill some feeling in those who see the structure." *Summum*, 555 U.S. 470. Such is the case with the murals at issue here.

2. **The Public Reasonably Interprets the Government To Be the Speaker of Messages Painted on City Streets.**

The murals at issue are reasonably interpreted to be government speech. Plaintiff's own allegations suggest as much. Plaintiff contends that "Mayor Bowser plainly approved and supports the painting of 'Black Lives Matter' on 16th Street and either approved or acquiesced in the painting of 'Defund the Police.'" Compl. ¶ 10. Plaintiff presumably reached this conclusion that the government approved of the murals' messages based on its own observations, just as the members of the public are likely to arrive at the same reasonable interpretation upon viewing the murals.

Indeed, when the government chooses to display art, "the public would reasonably interpret the government to be the speaker, in that it selects specific art for display." *Raven*, 334 F. Supp 3d at 32. And it is that "government's selection itself [that] conveys a government message:  the government considers the artist's work to be worthy of public display and consideration." *Id*. Here, a reasonable observer viewing large murals on 16th Street would reasonably assume the government considered the artwork worthy of consideration and selected it for display.

16

3.      **The Government Maintains Editorial Control over Messages Displayed on City Streets.**

The selection of artwork to display in public spaces is a classic example of editorial discretion and supports a finding of government speech. *Gittens*, 414 F.3d 23, 28 (finding that the government engages in its own speech by using "editorial discretion in the selection and presentation of" particular works of art) (internal quotation marks omitted); *Pulphus*, 249 F. Supp. 3d at 253 (same).

Here, the District exercised direct control over both murals. The Black Lives Matter mural was painted at the direction of the Mayor's office, organized by a District agency, and painted by artists commissioned by the government and members of the community. Compl. ¶¶ 7, 10; *see also Black Lives Matter, MuralsDC, and the Making of History,* MuralsDC, *available at* https://muralsdcproject.com/black-lives-matter-muralsdc-the-making-of-history/. Although the Defund the Police mural was later placed next to the Black Lives Matter mural without permission, the District exercised control over the artwork by editing the original display (*i.e.*, repainting stars over the District flag that were previously removed) and allowing the remaining mural to stay on the street. Compl. ¶¶ 8-9; *see also Activists Painted Defund the Police Next to the New Black Lives Matter Mural,* NPR (June 8, 2020), *available at* https://www.npr.org/local/305/2020/06/08/872234932/activists-painted-defund-the-police-next-to-the-new-black-lives-matter-mural.

**B.** **The District Was Not Required To Provide Plaintiff with a Process for Painting Its Own Expressive Message Because the Black Lives Matter and Defund the Police Murals Are Government Speech.**

Given that the murals are government speech, plaintiff's claim that it has been improperly denied a request to paint its own mural fails because the District has not created a forum for expressive speech. Plaintiff's complaints about "arbitrary" and insufficient procedures and policies for obtaining a permit to paint its message on a city street is a red herring. *See* Compl. ¶ 19. Here—even taking as true plaintiff's contention that the government engaged in an arbitrary process in denying its request to paint District streets—the District was not required to provide plaintiff with any such process in the first place. *See Cornelius*, 473 U.S. at 799-800 ("Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities."). Plaintiff cannot show that the District is required to dole out permits for painting its streets or that the failure to do so violates any First Amendment rights to expression. And the District does not have to address both sides of any matter when it speaks as the government. *See Summum*, 555 U.S. at 471 ("We think it is fair to say that throughout our Nation's history, the general government practice with respect to donated monuments has been one of selective receptivity."). "As a speaker, and as a patron of the arts, the government is free to communicate some viewpoints while disfavoring others, even if it is engaging … in 'utter arbitrariness' in choosing which side to defend and which side to renounce." *Gittens*,

18

414 F.3d at 30-31; *id.* at 28 (noting that a curator of a state-owned museum can choose to include busts of only Union generals but not Confederate generals and "[t]he First Amendment has nothing to do with such choices").

## C.    A Forum Analysis Is Inapplicable to Government Displays of Artwork.

A determination that the murals at issue are government speech would be further supported by the fact that a forum analysis would be inapplicable in this context, if not outright unworkable. Courts generally recognize three types of government-controlled forums: traditional public forums, designated public forums, and nonpublic forums. *Minnesota Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018). But as discussed below, none of these types of forums are applicable here.

### 1.    District Streets Are Not a Traditional Public Forum for Painting Messages.

Although streets are a traditional public forum for protesting, carrying signs, and passing out leaflets, city streets are not a traditional forum for painting messages. *See Cornelius*, 473 U.S. at 802 ("Traditional public fora are those places which 'by long tradition or by government fiat have been devoted to assembly and debate.'"); *Summum*, 555 U.S. at 478 ("Public parks have been used ... for purposes of assembly, communicating thoughts between citizens, and discussing public questions, but one would be hard pressed to find a long tradition of allowing people to permanently occupy public space with any manner of monuments.").

In *Summum*, the Supreme Court rejected attempts to "analogize the installation of permanent monuments in a public park to the delivery of speeches and the holding of marches and demonstrations" and rejected the argument that public

19

parks are a traditional public forum for the installation of monuments. *Summum*, 555 U.S. at 478. Here too, plaintiff cannot plausibly claim that city streets are a traditional forum for painting messages. *See Gittens*, 414 F.3d at 28-29 (finding that public displays of artwork was "far removed" from situations involving the government processing permits for a parade or applications for demonstrations in a park and that "those First Amendment constraints do not apply" to installations of artwork on public property).

The Supreme Court has distinguished between expressions that are temporary—like speakers who "eventually come to the end of their remarks" and people carrying signs who "at some point tire and go home"—and monuments that "monopolize the use of the land on which they stand and interfere permanently with other uses of the public space." *Id.* at 479. Here, the murals are like other permanent monuments in that they require physical removal to regain the use of the space—*i.e.*, they will not eventually "tire and go ho home"—and they interfere with other uses of the street, like the normal flow of traffic. Plaintiff has not alleged sufficient facts that could plausibly show that District streets are a traditional public forum for the display they seek. *Id.* at 464 ("[A]lthough a park is a traditional public forum for speeches and other transitory expressive acts, the display of a permanent monument in a public park is not a form of expression to which forum analysis applies."). *Cf. Mahoney v. Doe*, 642 F.3d 1112, 1117, 1119 (D.C. Cir. 2011) (finding that chalk art qualified as speech in a public forum when "the defacement at issue is temporary and can be cured").

The Supreme Court observed that the "forum doctrine has been applied in situations in which government-owned property was capable of accommodating a large number of public speakers without defeating the essential function of the land or program," which is not the case where permanent displays are placed in public spaces. *Summum*, 555 U.S. at 478. As the Court explained in *Summum*, there is limited space on public property and if governments had to accommodate *every* viewpoint through public displays they would have no displays at all or "brace themselves for an influx of clutter." *Id.* at 479. Moreover, "if public parks were considered to be traditional public forums for the purpose of erecting privately donated monuments, most parks would have little choice but to refuse all such donations." *Id.* at 480. For this reason, "where the application of forum analysis would lead almost inexorably to closing of the forum, it is obvious that forum analysis is out of place." *Id.*; *see also Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 49 n.9 (1983) (noting that is "untenable" to permit "any citizen's group or community organization with a message for school personnel" to access the school's mailboxes because it would "invite schools to close their mail systems to all but school personnel"). Therefore, "as a general matter, forum analysis simply does not apply to the installation of permanent monuments on public property." *Summum*, 555 U.S. at 480.

2.  **The District Has Not Created a Limited or Designated Public Forum Because It Has Not Intentionally Opened Its Streets for Paintings.**

The District has also not created a limited or designated public forum here. A limited or designated public forum is created when the government intentionally opens a nontraditional forum for public discourse between certain groups, or reserves a forum for specific groups or discussion of certain topics. *Walker*, 576 U.S. at 215 (finding Texas license plates were not a limited public forum even though members of the public submitted designs for the plates). "The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." *Cornelius*, 473 U.S. at 802; *see id.* at 804 (finding that the government's workplace charity drive did not create a limited public forum for use by all charitable organizations to solicit funds from federal employees when the government limited participation and it did not have a policy or practice "consistent with an intent to designate … [a] public forum open to all tax-exempt organizations").

Here, the District has not intentionally opened its public streets for painting—a nontraditional forum—as a manner of public discourse. Instead, the District commissioned one mural on 16th Street (Black Lives Matter mural) and another mural was placed alongside it without permission but was allowed to remain (Defund the Police mural) after the District exercised editorial control. Plaintiff's complaint about the lack of procedure for obtaining permission to paint a street—and the District's concern that such a painting would interfere with traffic flow and

compromise safety—also shows that the government has not created a limited forum, even by choosing to display two murals on a city street. *See* Compl. ¶ 19; *Cornelius*, 473 U.S. at 804 ("In cases where the principal function of the property would be disrupted by expressive activity, the Court is particularly reluctant to hold that the government intended to designate a public forum.").

> ### 3. The District Has Not Created a Nonpublic Forum Because It Has Not Managed Government Property for Expressive Messages by Others.

The murals also did not create a "nonpublic forum, which exists where the government is acting as a proprietor, managing its internal operations." *Walker*, 576 U.S. at 216 (internal quotation marks omitted) (citing *International Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678-79 (1992)). A nonpublic forum does not exist where the government is engaged in expressive conduct, rather than "simply managing government property." *Id.* (finding that the selection of license plates designs was expressive conduct). For example, in *Walker*, the Supreme Court found that the government's approval of a license plate design was an expressive act (not a nonpublic forum), and distinguished that conduct from its management of an internal mail system used by private organizations to communicate (a nonpublic forum). *See id.* at 218 (citing *Perry Educ. Ass'n*, 460 U.S. at 48-49).

Here, as in *Walker,* the District exercised control of the message conveyed in the murals when it commissioned the Black Lives Matter mural and allowed the Defund the Police mural to remain on 16th Street after using its editorial discretion. *Walker*, 576 U.S. at 217 ("The fact that private parties take part in the design and

propagation of a message does not extinguish the governmental nature of the message or transform the government's role into that of a mere forum-provider."); *see also Activists Painted Defund the Police Next to the New Black Lives Matter Mural*, NPR (June 8, 2020), *available at* https://www.npr.org/local/305/2020/06/08/872234932/activists-painted-defund-the-police-next-to-the-new-black-lives-matter-mural. And unlike other nonpublic forums, the District does not maintain its streets as space that has been "traditionally available for private speech," such as a space for commercial advertising. *Walker*, 576 U.S. at 218 (citing *Lehman v. City of Shaker Heights*, 418 U.S. 298 (1974)). In short, plaintiff has pled no facts that could support a claim that District streets are a nonpublic forum.

> ### D.   Even if the Court Found that a Forum Analysis Applied Here, Plaintiff Cannot Establish that the District's Failure To Accommodate Plaintiff's Proposed Mural Constitutes Viewpoint Discrimination.

Even if a forum analysis applied here, plaintiff still cannot state a claim because it has not been subject to viewpoint discrimination. Because the purpose of a traditional public forum is the free exchange of ideas, speakers can only be excluded when there is a compelling state interest and the exclusion is narrowly tailored to promote that interest. *Cornelius*, 473 U.S. at 800. The same is true in limited public forums. *Perry Educ. Ass'n*, 460 U.S. at 45-46. Here, the government has a compelling interest in promoting public and traffic safety. As the District explained in its response to plaintiff's request, painting a public street would likely conflict with road markings and interfere with the normal flow of traffic, which would require the street

to be closed. Compl. ¶¶ 13, 15. Requiring permits for street closures is a narrowly tailored means of promoting this interest in public and traffic safety. *McCullen v. Coakley*, 573 U.S. 464, 486 (2014) ("We have, moreover, previously recognized the legitimacy of the government's interests in ensuring public safety and order [and] promoting the free flow of traffic on streets and sidewalks ...") (internal quotation marks and citation omitted). Moreover, according to plaintiff, the District has not granted a permit to any other individual or entity for purposes of painting a street mural, so plaintiff cannot establish that it has been denied a permit based on its viewpoint. Compl. ¶ 24.

Restrictions on speech in a nonpublic forum are permissible as long as they are reasonable and not an effort to suppress the speaker's views. *Mansky*, 138 S. Ct. at 1885; *see also Int'l Soc. For Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672 (1992) (finding that when restrictions of speech are challenged in a nonpublic forum the restrictions "need only satisfy a requirement of reasonableness"). The Supreme Court's "forgiving standard of review" defines a reasonable restriction on speech as one that is "capable of reasoned application" and provides "'objective, workable standards' to guide a government official's exercise of discretion." *Zukerman v. United States Postal Serv.*, 961 F.3d 431 (D.C. Cir. 2020) (quoting *Mansky*, 138 S. Ct. at 1888, 1892). Here, as plaintiff claims, the District has not provided the opportunity for any members of the public to obtain a permit to paint a street with their own message, *see* Compl. ¶ 12, and, in fact, such conduct is prohibited. *See, e.g.*, 24 DCMR § 2102 (prohibiting anyone from displaying signs or markings that would hide or

interfere with the effectiveness of traffic control devices). This restriction is reasonable and consistent with the city's interest in maintaining public and traffic safety, and is therefore permissible in nonpublic forums. *See Initiative & Referendum Inst. v. U.S. Postal Serv.*, 685 F.3d 1066, 1073 (D.C. Cir. 2012) ("A regulation is reasonable if it is consistent with the government's legitimate interest in maintaining the property for its dedicated use.").

II.  **Plaintiff Cannot Establish Municipal Liability Under Section 1983 Because It Has Not Alleged that the Purported Constitutional Violation Is Attributable to a District Policy or Custom, or that Any Such Policy or Custom Was the "Moving Force" Behind the Purported Injury.**

Under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), a municipal government cannot be sued under Section 1983 "for an injury inflicted solely by its employees or agents." *Id.* at 691.[4] For a plaintiff to state a Section 1983 claim against a municipal government under these circumstances, the plaintiff must allege that the purported constitutional injury was caused by an official policy or custom of the municipality. *Id.* at 694. To do so, the plaintiff must allege that (1) it suffered a predicate constitutional injury; and (2) there was an affirmative link between the predicate constitutional injury and an official policy or custom of the

---

[4]     Plaintiff brings claims against three District government officials in their official capacities. Compl. ¶¶ 4-6. However, a claim against a government official in his or her official capacity "is not a suit against the official but rather is a suit against the official's office" and therefore "is no different from a suit against the [government] itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). Plaintiff's claims should therefore be construed as claims against the District. *See Price v. District of Columbia*, 545 F. Supp. 2d 89, 93 and n.7 (D.D.C. 2008) (the principle that Section 1983 suits for damages against municipal government officials in their official capacities are the equivalent to a suit against the municipality itself "would seemingly apply" to cases for declaratory and injunctive relief).

District such that the policy or custom was the "moving force" behind the plaintiff's injury. *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003). Plaintiff has failed to do so here. Although plaintiff alleges that it has suffered a constitutional injury based on a violation of its First Amendment rights, it has failed to allege, much less establish, that this purported violation is attributable to the District.

A.   <u>Plaintiff Has Not Alleged that Its Purported Constitutional Injury Is Attributable to an Official Policy or Custom of the District.</u>

As a threshold matter, plaintiff has not alleged that its purported constitutional injury is attributable to the District in any manner that has been recognized by the D.C. Circuit. In Section 1983 claims, acts of government officials could be attributable to a municipal government through (1) "the explicit setting of a policy by the government that violates the Constitution"; (2) "the action of a policy maker within the government"; (3) "a knowing failure to act by a policy maker of actions by his subordinates that are so consistent that they have become 'custom'"; or (4) "the failure of the government to respond to a need (for example, training of employees) in such a manner as to show 'deliberate indifference' to the risk that not addressing the need will result in constitutional violations." *Id.* Plaintiff has not clarified which, if any, of these theories it is relying on to establish municipal liability.

As the D.C. Circuit has held, "a plaintiff must plead the elements of the relevant type of municipal liability" because it is "not [the court's] role" to "try to surmise which theory of municipal liability has the strongest support in the complaint." *Blue v. District of Columbia*, 811 F.3d 14, 20 (D.C. Cir. 2015). "If the plaintiff fails to identify the type of municipal policy at issue, the court would be

unable to determine … whether the plaintiff had provided plausible support for her claim." *Id.* In short, plaintiff cannot state a claim for relief against the District without explaining how the allegedly unconstitutional acts of the District's employees or agents are attributable to the District itself through an official policy or custom. *See id.* ("[I]n order for the district court to assess whether Blue stated a facially plausible complaint, Blue needed to assert the elements of the type of municipal policy that caused her injury. Blue failed to do so."); *see also Hodges v. District of Columbia*, 975 F. Supp. 2d 33, 54 (D.D.C. 2013) ("The fact that this claim arises under section 1983 does not relieve Jackson of the obligation to satisfy the criteria established in *Iqbal* and *Twombly*."). Plaintiff has not provided that explanation, and the Complaint should be dismissed on that basis alone.

## B. There Is No Policy or Custom Related to Accommodating the Public's Requests for Street Paintings.

Even if the Court were to "try to surmise" plaintiff's theory for how its alleged constitutional injury is attributable to the District through an official policy or custom, as discussed below, plaintiff cannot establish that any such policy or custom exists.

### 1. The District Does Not Have an Express Municipal Policy for Accommodating Street Paintings by the Public.

Plaintiff cannot base its theory of municipal liability on an express municipal policy. Unlike the plaintiff in *Monell*, who challenged a municipal sick-leave policy, 436 U.S. at 660-61, plaintiff cannot point to any express municipal policy that purportedly caused a constitutional injury; the District does not have an express

policy—or even an implicit policy—for closing streets to accommodate street paintings by nongovernment actors on public space.

At best, plaintiff has alleged that the District has an unspoken policy of treating street paintings by Black Lives Matter protesters differently from street paintings by plaintiff, which plaintiff is extrapolating from some combination of the District's lack of a process for closing streets to accommodate street paintings and the failure to remove the Defund the Police mural. That is a far cry from an express municipal policy.

What is more, plaintiff cannot rely on allegations that the District has a nebulous, nonexistent policy related to street paintings as the basis for establishing municipal liability. *See City of Oklahoma v. Tuttle*, 471 U.S. 808, 822 (1985) (finding that "the [alleged policy failure to train police officers] that respondent [sought] to rely upon" as the basis for establishing municipal liability was "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*"). Though the Supreme Court has provided only limited guidance for what qualifies as official policy for purposes of *Monell* liability, the Court *has* said that plaintiffs cannot "circumvent[ ] *Monell*'s limitations altogether" by attempting to infer some nebulous policy from a single incident "and at the same time sanction[ ] the inference that the 'policy' was the cause of the incident." *Id.* at 823.

As the Court recognized, "[I]f one retreats far enough from a constitutional violation some municipal 'policy' can be identified behind almost any such harm inflicted by a municipal official." *Id.* at 823. But when a plaintiff seeks to establish

municipal liability based on an express municipal policy there has to be an "existing, unconstitutional policy," and the existence of such a municipal policy "must be separately proved." *Id.* at 823-24. Plaintiff cannot separately prove that the District has an express policy for how to accommodate street paintings by the public. Therefore, it cannot rely on an express policy as the basis for establishing the District's liability.

> ### 2. The District's Failure to Remove the Defund the Police Mural and Failure to Issue Plaintiff's Requested Permit Were Not Actions of a Policymaker in the Area of Accommodating Street Paintings by the Public.

Additionally, plaintiff cannot establish municipal liability based on a single decision by a policymaker. Although plaintiff could argue that the Mayor made a single decision on behalf of the District to not remove the Defund the Police mural or by effectively denying plaintiff's request for a permit,[5] that is not enough to establish municipal liability against the District. To establish *Monell* liability against the District based on the Mayor's (or her subordinates') inaction, plaintiff would have to show that the Mayor was a policymaker in the relevant area at issue in this case—accommodation of street paintings by the public. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988). Here, however, the failure to remove the Defund the Police mural or issue plaintiff a permit—both of which were, at most, single acts of a

---

[5]     In the Complaint, plaintiff alleges that DPW announced on June 7, 2020 that the Defund the Police mural would not be removed, and that Mayor Bowser "either approved or acquiesced in the painting," and that Mayor Bowser, Acting Deputy Mayor Falcicchio and Director Marootian effectively denied its request for a permit because they "have not responded substantively." Compl. ¶¶ 9-10, 23.

government official—do not amount to acts of a policymaker "in the relevant area at issue in this case."

Whether the Mayor is a "policymaker" in the relevant area at issue is a question of state law, *see Pembaur*, 475 U.S. at 483, which determines whether a government official has policymaking authority in that particular area. For purposes of *Monell* liability, isolated acts of executive discretion are not "edicts or acts" that "may fairly be said to represent official policy." *Monell*, 436 U.S. at 694.[6] "[D]iscretion in the exercise of particular functions does not, without more, give rise to municipal liability based on the exercise of that discretion." *Pembaur*, 475 U.S. at 482.

Under District of Columbia law, the legislative power "is vested in and shall be exercised by the Council." D.C. Code § 1-204.04(a). The legislative power of the Council is clearly policymaking authority. *Pembaur*, 475 U.S. at 480. Although the Mayor has some policymaking authority too, such as the authority to issue administrative orders, rules and regulations,[7] the Mayor is also responsible for

---

[6]     *Compare Pembaur*, 475 U.S. at 480 ("[A] municipality may be liable under § 1983 for a single decision by its properly constituted *legislative body* … because even a single decision by such a body unquestionably constitutes an act of official government policy.") (emphasis added), *with Praprotnik*, 485 U.S. at 128 (finding no municipal liability for alleged policy of employment retaliation when plaintiff "d[id] not contend that anyone in city government ever promulgated, or even articulated, such a policy" and "[t]he Mayor and Alderman enacted no ordinance designed to retaliate against respondent or similarly situated employees"); *see* 18A McQuillin Mun. Corp. § 53:178.34 (3d ed.) (noting that "at least one court has held that only officials acting in a legislative capacity can be said to make policy" because policy "implies a rule to govern future conduct, and an isolated act by an executive does not carry any such implication.").

[7]     *See* D.C. Code § 1-204.22(11) ("The Mayor is also authorized to issue and enforce administrative orders, not inconsistent with this or any other Act of the

numerous discretionary executive functions, *see* D.C. Code § 1-204.22 ("The Mayor shall be responsible for the proper execution of all laws relating to the District, and for the proper administration of the affairs of the District coming under his jurisdiction or control[.]").

Unlike acts of the Council or administrative orders, rules or regulations issued by the Mayor, the Mayor's isolated acts of executive discretion are not "edicts or acts" that "may fairly be said to represent official policy." *Monell*, 436 U.S. at 694; *see Praprotnik*, 485 U.S. at 121 (a municipal government may be "sued directly" under Section 1983 "if it is alleged to have caused a constitutional tort through 'a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.'" (quoting *Monell*, 436 U.S. at 690)). The Mayor has not acted under any policymaking authority in the circumstances presented in this case and does not qualify as a policymaker in the relevant area at issue.

As discussed below, this conclusion is supported by case law from the Supreme Court and the D.C. Circuit.

> **a.** **Supreme Court Case Law Supports the Conclusion that an Executive Official's Isolated Discretionary Acts Do Not Make that Official a "Policymaker."**

The Supreme Court first addressed whether a single action of a purported policymaker could establish municipal liability in *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986). In *Pembaur*, the Court explained that acts of a municipality's

---

Congress or any act of the Council, as are necessary to carry out his functions and duties.").

legislative bodies are "unquestionably" official policy. *Id.* at 480. However, the Court added, "[N]ot every decision by municipal *officers* automatically subjects the municipality to § 1983 liability." *Id.* at 481 (emphasis added). Mere acts of executive discretion are not attributable to the government. *Id.* at 482.

To illustrate this point, the Court compared the decisions of a County Sheriff—an executive official who has the authority to make final decisions about hiring and firing employees—with that of the Board of County Commissioners, which is the legislative body that sets the municipality's employment policies. *Id.* at 483 n.12. The Court opined that a single decision by the County sheriff to fire an employee would not give rise to municipal liability because the Board of County Commissioners, not the Sheriff, is the policymaker for the municipality on employment decisions. *Id.*

A one-time decision by the Mayor under her authority as chief executive for the District is not the sort of "policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers" that could give rise to municipal liability. *Monell*, 436 U.S. at 690. And nothing about the Mayor's inaction qualifies as an act of a policymaker.[8]

This conclusion is further supported by the Supreme Court's holding in *City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988). There, the Court held that the plaintiff failed to establish municipal liability for an alleged policy of retaliation against

---

[8]     That is not to say that *no* acts of the Mayor could give rise to municipal liability. As noted above, in addition to executing the laws, the Mayor is also authorized to issue administrative orders, rules and regulations, which, unlike isolated acts of executive discretion, could qualify as the official policies of the District.

employees when the plaintiff "d[id] not contend that anyone in city government ever promulgated, or even articulated, such a policy." *Id.* at 128. The Court noted that "[t]he Mayor and Aldermen" did not qualify as policymakers in the area of employee retaliation because they "enacted no ordinance designed to retaliate against respondent or against similarly situated employees." *Id.* In addition, the Court rejected the argument that a municipality could be held liable on the theory that a municipal agent acted as a *de facto* policymaker. *Id.* at 131 (rejecting "the vague concept of '*de facto* final policymaking authority'" and noting that "ad hoc searches for officials possessing such '*de facto*' authority would serve primarily to foster needless unpredictability in the application of § 1983"). So too here. Plaintiff cannot rely on the theory that the Mayor has acted as a *de facto* policymaker.

      **b.**    **D.C. Circuit Case Law Also Supports the Conclusion that an Executive Official's Isolated Discretionary Acts Do Not Make that Official a "Policymaker."**

Although the D.C. Circuit has not expressly defined a "policymaker" for purposes of *Monell* liability, it provided significant guidance about who qualifies as a policymaker in *Singletary v. District of Columbia*, 766 F.3d 66 (D.C. Cir. 2014). There, the court considered whether the District could be held liable for an individual parole revocation decision by the Board of Parole. The court concluded that the revocation decision was not attributable to the District because the Board of Parole was not a final policymaker in the area of parole revocation. *Id.* at 73. The court emphasized that it was the Mayor, not the Board, who possessed the "authority to establish rules governing the Board's proceedings," and that "there [was] no suggestion or allegation

that the Board acted under direction of any such rule." *Id.* at 74. Although the Board did have the authority to "render final revocation decisions in individual cases," the court held that "such discretion is insufficient to create municipal liability." *Id.*

The D.C. Circuit's holding in *Singletary* thus supports the proposition that, for purposes of determining who is an official policymaker under District law, a single discretionary act by an executive official does not give rise to municipal liability under *Monell.*[9]

### 3.   There Is No Custom Related to Accommodating Street Paintings by the Public.

Plaintiff also cannot establish that the alleged constitutional violation was based on a "custom" of the District. To establish municipal liability based on a custom of the District, plaintiff must offer "proof of a persistent, pervasive practice, attributable to a course deliberately pursued by official policy-makers" that "caused the deprivation of constitutional rights plaintiffs experienced." *Carter v. District of Columbia*, 795 F.2d 116, 125-26 (D.C. Cir. 1986). At most, plaintiff alleges that

---

[9]     This conclusion is also supported by the decisions of other circuits. *See, e.g.*, *Bolton v. City of Dallas*, 541 F.3d 545, 550-51 (5th Cir. 2008) (holding that a City Manager was not a policymaker for the decision to fire a police chief because the City Manager was "an *executive and administrative* official" who only had "financial *decisionmaking* authority," the City Council had not "delegated policymaking power to the city manager," and "neither complete discretionary authority nor the unreviewability of such authority automatically results in municipal liability"); *Auriemma v. Rice*, 957 F.2d 397, 400 (7th Cir. 1992) (stating that "[t]he President, a cabinet officer, or his delegate makes the final decision in the implementation of the laws without changing the fact that the President executes rather than makes law," and "the chief bureaucrat who signs off on a particular action" is not necessarily the "'policymaker' for that action.").

District officials committed a single constitutional violation by refusing to provide plaintiff with a permit to close a street based on plaintiff's viewpoint. But to state a claim that the District has a custom of unconstitutionally refusing to issue street closure permits, plaintiff would have to allege that there were more than mere scattered occurrences of allegedly unconstitutional conduct. *Carter*, 795 F.2d at 123. Such allegations "do not coalesce into a discernible 'policy.'" *Id.*; *see Ellis v. District of Columbia*, 84 F.3d 1413 (D.C. Cir. 1996) ("Even if mistakes were made in some instances, 'it is not reasonable to extrapolate a general policy of lawlessness from such mistakes.'" (quoting *Wash. Mobilization Cmte. v. Cullinane*, 566 F.2d 107, 123 (D.C. Cir. 1977)); *Lightfoot v. District of Columbia*, 246 F.R.D. 326, 335 (D.D.C. 2007) ("[E]pisodic failures of process do not make out a constitutional violation.").

### 4. The District Was Not Deliberately Indifferent to Any Alleged Constitutional Violation.

Finally, plaintiff cannot show that the District was deliberately indifferent to any constitutional violation committed by its employees or agents. To establish municipal liability under that theory plaintiff would have to show that, from an objective standpoint, the District knew or should have known about a risk of constitutional violations. *Baker*, 326 F.3d at 1307.

When a municipality has "actual or constructive knowledge that its agents will probably violate constitutional rights" it is not permitted to "adopt a policy of inaction." *Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004). For example, the Supreme Court has allowed *Monell* claims to go forward based on allegations that the municipality failed to properly train police officers "when the

failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). In *City of Canton*, the Court found that the need for training was apparent because it was "so obvious" that interactions with police were "likely to result in the violation of constitutional rights." *Id.* at 390. Under those circumstances, "the failure to provide proper training may fairly be said to represent a policy for which the city is responsible." *Id.* But here, unlike in *City of Canton*, it is far from "obvious" that constitutional rights will be violated absent some change in the District's permitting practices.

Moreover, even if there were a risk of constitutional injury, plaintiff could not establish that the District was deliberately indifferent to that risk. Deliberate indifference is a "stringent standard of fault," *Connick v. Thompson*, 563 U.S. 51, 69 (2011), because "[i]n virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident." *City of Canton*, 489 U.S. at 392. It is well settled that municipal governments "cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691. And allowing plaintiff to establish municipal liability on a deliberate indifference theory here would effectively "collapse [the deliberate indifference standard] into *respondeat superior*" because there was no obvious risk of any potential constitutional violation absent a change in District employees' conduct. *Connick*, 563 U.S. at 69.

37

**C.**     **Even If the District Had an Official Policy or Custom Related to Accommodating Street Paintings by the Public, Plaintiff Could Not Establish that the Policy or Custom Was the Moving Force Behind Its Purported Constitutional Injury.**

To state a claim against the District, in addition to identifying a relevant District policy or custom, plaintiff would also have to show that the policy or custom "*caused* their injury." *Connick*, 563 U.S. at 50 (emphasis added) (quoting *Monell*, 436 U.S. at 691). To accomplish this, plaintiff would have to allege that there was an "affirmative link" between the policy or custom and the purported constitutional violation such that the policy or custom "was the 'moving force' behind the constitutional violation." *Baker*, 326 F.3d at 1306. But here there was no correlation between the failure to remove the Defund the Police mural and the failure to provide plaintiff with a process for painting its proposed display. All plaintiff has alleged is that there were two unrelated instances of District officials failing to act. *Cf. Jeffries v. District of Columbia*, 917 F. Supp. 2d 10, 51 (D.D.C. 2013) (finding that plaintiff "d[id] not draw any connection between the specific actions it alleges the District took" and "an established policy of inadequate training").

Even if a relevant policy or custom existed, the Complaint is devoid of allegations that a policy or custom actually caused plaintiff's injury. The District does not have a process for nongovernment actors to request a permit to close a street to accommodate a street painting, and the Defund the Police mural did not lead to any change in the District's pre-existing policies (or lack thereof). Indeed, as plaintiff alleged in the Complaint, "no process or procedure exists to request a permit to paint an expressive message on the surface of a District street." Compl. ¶ 24. And the

failure to remove the Defund the Police mural could not have been the "moving force" behind any decision not to have a process for requesting the permit plaintiff requested because the District did not have a process for requesting that type of permit before the Defund the Police mural was painted either. In short, plaintiff cannot show that there was an affirmative link between any policy or custom of the District and its failure to provide plaintiff with a process for painting its proposed mural.

## CONCLUSION

For the foregoing reasons, the Court should dismiss plaintiff's Complaint with prejudice.

Dated:  July 27, 2020.                Respectfully submitted,

                                      KARL A. RACINE
                                      Attorney General for the District of Columbia

                                      TONI MICHELLE JACKSON
                                      Deputy Attorney General
                                      Public Interest Division

                                      /s/ Fernando Amarillas
                                      FERNANDO AMARILLAS [974858]
                                      Chief, Equity Section

                                      /s/ Pamela A. Disney
                                      PAMELA A. DISNEY [1601225]
                                      GAVIN N. PALMER [1619264]
                                      Assistant Attorneys General
                                      441 Fourth Street, N.W., Suite 630 South
                                      Washington, D.C.  20001
                                      (202) 807-0371
                                      pamela.disney@dc.gov

                                      Counsel for Defendants