# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JUDICIAL WATCH, INC., | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Civil Action No. 20-1789 (TSC) |
| | ) | |
| MURIEL BOWSER, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |
| _____ | ) | |

## PLAINTIFF'S OPPOSITION TO DEFENDANTS'
## MOTION TO DISMISS; REQUEST FOR ORAL HEARING

Paul J. Orfanedes (DC Bar No. 429716)
Michael Bekesha (DC Bar No. 995749)
JUDICIAL WATCH, INC.
425 Third Street SW, Suite 800
Washington, DC 20024
Tel:    (202) 646-5172
Fax:    (202) 646-5199
Email: porfanedes@judicialwatch.org
          mbekesha@judicialwatch.org

T. Russell Nobile*
JUDICIAL WATCH, INC.
Post Office Box 6592
Gulfport, Mississippi 39506
Tel:    (202) 527-9866
Email: rnobile@judicialwatch.org

* Application for admission *pro hac vice*
  forthcoming

Dated:  August 21, 2020          *Counsel for Plaintiff*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.      INTRODUCTION ...................................................................................................1

II.     FACTUAL BACKGROUND ..................................................................................3

III.    ARGUMENT .........................................................................................................14

    A.      Legal Standards.............................................................................................14

    B.      No Government Speech .................................................................................17

        1.      Street Painting Has Never Been Used for Government Speech ................23

        2.      The Public Does Not Reasonably Interpret the District to Be
             the Speaker.....................................................................................24

        3.      The District Did Not Maintain Editorial Control......................................27

    C.      Forum Analysis.............................................................................................30

    D.      Government Regulation and Viewpoint Discrimination ...............................34

    E.      Plaintiff Did Not Bring A Municipal Liability Claim ............................37

IV.     CONCLUSION......................................................................................................39

## **TABLE OF AUTHORITIES**

**Page**

<u>**Cases**</u>

*Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*,
    901 F.3d 356 (D.C. Cir. 2018) ....................................................................34, 37

*A.N.S.W.E.R. Coal. v. Jewell*,
    153 F. Supp.3d 395 (D.D.C. 2016) ......................................................19, 25, 34

*Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*,
    897 F.3d 314 (D.C. Cir. 2018) ...............................................................................30

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ....................................................................................................15

*Boardley v U.S. Dep't of the Interior*,
    615 F.3d 508 (D.C. Cir. 2010) ...............................................................................36

*Carroll v. Commissioners of Princess Anne*,
    393 U.S. 175 (1968) ..............................................................................................8, 36

*Child Evangelism Fellowship of S.C. v. Anderson Sch. Dist. Five*,
    470 F.3d 1062 (4th Cir. 2006) ..........................................................................36, 37

*City of Los Angeles v. Preferred Commc'ns*,
    476 U.S. 488 (1986) ....................................................................................................14

*Conley v. Gibson*,
    355 U.S. 41 (1957) ......................................................................................................15

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
    473 U.S. 788 (1985) ..................................................................................30, 32, 34

*EEOC v. St. Francis Xavier Parochial Sch.*,
    117 F.3d 621 (D.C. Cir. 1997) .......................................................................15, 27

*\*Forsyth Cnty. v. Nationalist Movement*,
    505 U.S. 123 (1992) .............................................................................................34, 35

*Hedgepeth v. Wash. Metro. Area Transit Auth.*,
    386 F.3d 1148 (D.C. Cir. 2004) .......................................................................38, 39

*Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*,
    452 U.S. 640 (1981) ....................................................................................................34

*Los Angeles Cnty. v. Humphries*,
  562 U.S. 29 (2010).........................................................................................38

*\*Mahoney v. Doe*,
  642 F.3d 1112 (D.C. Cir. 2011).................................................22, 30, 31, 32, 34

*Monell v. Dep't of Social Servs.,*
  436 U.S. 658 (1978)................................................................................37, 38

*Nat'l Ass'n of Mfrs. v. Perez*,
  103 F. Supp.3d 7 (D.D.C. 2015).........................................................................20

*Norse v. City of Santa Cruz*,
  629 F.3d 966 (9th Cir. 2010) .............................................................................36

*People for the Ethical Treatment of Animals, Inc. v. Gittens*,
  414 F.3d 23 (D.C. Cir. 2005)..............................................................19, 20, 22, 29

*Pleasant Grove City v. Summum*,
  555 U.S. 460 (2009)............................................................19, 21, 22, 23, 28

*Price v. Dist. of Columbia*,
  545 F. Supp.2d 89 (D.D.C. 2008).......................................................................39

*Pulphus v. Ayers*,
  249 F. Supp.3d 238 (D.D.C. 2017)...............................19, 20, 23, 24, 25, 26, 29

*Raven v. Sajet*,
  334 F. Supp.3d 22 (D.D.C. 2018), *aff'd sub nom. Raven v. United States*,
  2019 U.S. App. LEXIS 14849 (D.C. Cir. May 17, 2019)....................................19, 28, 29

*Ridley v. Massachusetts Bay Transp. Auth.*,
  390 F.3d 65 (1st Cir. 2004).................................................................................37

*Rosenberger v. Rector & Visitors of the Univ. of Virginia*,
  515 U.S. 819 (1995)...........................................................................................36

*Shuttlesworth v. Birmingham*,
  394 U.S. 147 (1969).......................................................................................34, 35

*\*Steinberg v. Gray*,
  815 F. Supp.2d 293 (D.D.C. 2011).......................................................................39

*\*Stewart v. D.C. Armory Bd.*,
  863 F.2d 1013 (D.C. Cir. 1988).............................................14, 18, 23, 30, 33

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*,
    576 U.S. 200 (2015)............................................................................19, 21, 23, 28, 34

*Will v. Michigan Dep't of State Police*,
    491 U.S. 58 (1989)........................................................................................38, 39

## Rules, Statutes, and Regulations

D.C. Code § 9-202.01 .................................................................................................21

D.C. Code § 9-631 .....................................................................................................21

D.C. Code § 22-3312.01 .......................................................................................22, 28

Fed. R. Evid. 201(b)...................................................................................................16

LCvR 7(f)....................................................................................................................1

10 DCMR § A1406.AC-2.1 ...............................................................................13, 21

18 DCMR § 2100.2......................................................................................................24

18 DCMR § 2201.8......................................................................................................24

18 DCMR § 2203.11....................................................................................................24

18 DCMR § 2405.1(b).................................................................................................24

20 U.S.C. § 75e(1) ......................................................................................................29

24 DCMR § 1400 ........................................................................................................21

Plaintiff Judicial Watch, Inc., by counsel, respectfully submits this opposition to Defendants' Motion to Dismiss.  Plaintiff also requests pursuant to Local Rule 7(f) an oral hearing on the motion.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.      INTRODUCTION.

"Black Lives Matter" and "Defund the Police" are political exhortations, not art.  "Black Lives Matter" also is the name of a nationally if not internationally recognized political movement, and "Defund the Police" is one of that movement's key demands.  Defendants' motion to dismiss ignores these facts to try to take advantage of a still-evolving line of cases concerning "government speech" to which the First Amendment does not apply.  The government speech doctrine has been applied to government-sponsored compilations of art and a limited number of other contexts.  It has never been applied to political slogans or messages and does not apply here.  As a result, Defendants cannot hide behind the government speech doctrine, and the First Amendment applies.

By allowing both "Black Lives Matter" and "Defund the Police" to be painted on a prominent District street – a traditional public forum – Defendants opened the door to other messages being expressed on the District's streets.  Images of "Black Lives Matter" and "Defund the Police" have circulated around the nation and the globe and inspired the painting of similar messages on streets in other cities, including New York City, San Francisco, Oakland, Sacramento, Los Angeles, Denver, and Seattle.  Obviously impressed by the power of these political statements in paint, others have sought to exercise their First Amendment rights by painting their own messages on city streets, with or without the permission of local governments.

To Plaintiff's knowledge, at least three organizations have formally requested permission to paint expressive messages on the District's streets since "Black Lives Matter" and "Defund the Police" were painted on 16th Street.  Each was treated very differently from the painters of "Black Lives Matter" and "Defund the Police."  Defendants largely ignored Plaintiff's request.  Eventually, Plaintiff was told to pursue a permit through the District Department of Transportation's online permit application process without any additional guidance, although Defendants now admit there is no permit for street painting.  When a veterans advocacy group requested permission to paint "Veterans Lives Matter" on the street in front of the headquarters of U.S. Department of Veterans Affairs a block from "Black Lives Matter" and "Defund the Police," the Mayor's Office of Legal Counsel told the group that they could not do so unless the street was closed and that they could apply for a block party or special event permit to have the street closed on a temporary basis.  In stark contrast to the painters of "Defund the Police," when a student organization sought to paint "Black Pre-Born Lives Matter" on a District street, police reportedly told them they could do so, and when they tried to write their message in chalk on a nearby sidewalk, they were nonetheless arrested.

The First Amendment requires more of Defendants.  Whether the District's streets are considered traditional public fora, designated or limited public fora, or nonpublic fora, the First Amendment forbids arbitrary treatment of requests to engage in expressive conduct and viewpoint discrimination.  As Plaintiff will demonstrate, Defendants' government speech and First Amendment arguments lack merit.  At a minimum, they raise issues of fact outside the Complaint.  They cannot be resolved on a motion to dismiss but must await trial.

## II.      FACTUAL BACKGROUND.

In the early morning hours of Friday, June 5, 2020, a team of artists, residents, District employees, and demonstrators painted "Black Lives Matter" on 16th Street NW near the White House.  Compl., para. 7.  Painted in large, "safety yellow" block letters, the message spanned the entire width of the street and covered nearly two blocks:



*Id.*  The following day, June 6, 2020, protesters painted "Defund the Police" next to the "Black Lives Matter" message on 16th Street NW.  *Id.*, para. 8.  Like the "Black Lives Matter" message, the "Defund the Police" message also was painted in "safety yellow" block letters:



*Id.*  The protesters also painted over the three stars in the District's crest such that the entire

message read, "Black Lives Matter = Defund the Police."  *Id.*, para. 9.  According to a Fox5

news report on June 7, 2020, District Department of Public Works' employees repainted the stars

on the crest.  *Id.*  According to the same report, the District Department of Public Works

announced that "Defund the Police" would not be removed.  *Id.*

Mayor Muriel Bowser plainly approved and supported the painting of "Black Lives

Matter" on 16th Street and either approved or acquiesced in the painting of "Defund the Police."

*Id.*, para. 10.  As of the date of the Complaint, both messages remained on display on 16th Street

NW.  At a press conference following the June 5, 2020 street painting, the Mayor stated, with

respect to the "Black Lives Matter" message, "There are people who are craving to be heard and

to be seen and to have their humanity recognized.  We had the opportunity to send that message

loud and clear on a very important street in our city."  *Id.*

On June 10, 2020, Plaintiff sent a letter to the Mayor and District Attorney General Karl

Racine requesting permission to paint its own message on a District street:

> We note with interest Mayor Bowser's recent decision approving the painting of "Black Lives Matter" on 16th Street NW and the approval of and/or acquiescence in the painting of "Defund the Police" alongside the first message.  Both messages are expressive activity.
>
> Judicial Watch, Inc. is a Washington, DC-based, non-profit organization headquartered in Southwest DC.  For more than twenty-five years, Judicial Watch, Inc. has promoted transparency, accountability and integrity in government and fidelity to the rule of law.  Our motto is "Because No One Is Above the Law!" – a message that is particularly relevant today because it applies equally to law enforcement and public officials as well as to protesters, looters, and rioters.
>
> Because DC streets surfaces are now being used as public fora for expressive activity, we would like to have our motto painted on a street, preferably Independence Avenue SW, between 2nd and 4th Streets SW, which is near our offices.  The lettering would be identical in size and color to the lettering used to paint "Black Lives Matter" on 16th Street NW. Judicial Watch, Inc. would pay the cost of the painting, but we would likely need the assistance of the DC Government to aid in traffic diversion and parking restrictions while the painting is completed.  Of course, the painting could be completed when traffic is typically light, as was done with the "Black Lives Matter" message.
>
> As the timeliness of our message is important, please respond within 3 working days. If the Independence Avenue location is not possible, we are open to considering alternative locations.

*Id.*, para. 11.  Before preparing and sending the letter, Plaintiff reviewed the District Department

of Transportation's permit applications webpage to determine whether the District had any

existing processes or procedures in place for requesting a street painting permit.  *Id.*, para. 12.

The webpage and subpages referenced therein contained no reference to street paintings or any

reasonably analogous subjects.  *Id.*  Plaintiff also was unable to identify or recall any similar use

of District streets for painting expressive messages.  *Id.*

On June 12, 2020, Interim Deputy Mayor John Falcicchio (now Deputy Mayor)

responded to Plaintiff by representing that its request had been referred to the District

Department of Transportation for review.  *Id.* para. 13.  The Deputy Mayor also added that the request "is unlikely to be approved on an active roadway because the paint would conflict with road markings."  *Id.*  He further noted that "Black Lives Matter Plaza," in reference to the two blocks on 16th Street NW between H and K Streets NW where the two messages had been painted on the street surface, "is closed to traffic at this time and thus avoiding that hurdle."  *Id.*

Plaintiff responded to the Deputy Mayor on Monday, June 15, 2020:

Thanks for the heads up.  If it is the City's position that street painting is only allowed on closed roadways, please advise us which DC roadways are currently closed and how long they are expected to remain closed so we can plan accordingly.  It is our understanding that, at least as of June 12, H and I Streets NW were closed between 15th and 17th NW, 16th Street NW was closed between H and K Streets NW, and Connecticut and Vermont NW were closed between H and I Streets NW.  However, the relevant MPD Traffic Advisory only noted traffic closures and restrictions at these locations for June 13 and 14.

Alternatively, is it possible to request a closure to accommodate a street painting, and, if so, how long would the closure last?

*Id.*, para. 14.  The Deputy Mayor replied that same day, asserting: "Thanks for circling back. While Black Lives Matter Plaza will remain closed until further notice, the roads you mentioned begin to reopen today."  *Id.*, para. 15.  He provided no information about other closed roadways or how to request a closure to accommodate a street painting.  *Id.*

When Plaintiff received no further word from the Deputy Mayor about a street closure requirement or a response to its request from the District Department of Transportation, it wrote to him again on June 18, 2020:

We still have not received a response to our original request, submitted over a week ago, and the extent to which street closure remains an issue is unclear to us. Please advise us if DC has any policies or procedures governing street paintings and street closures to accommodate street paintings.  We have not been able to find any.

To the extent street closure is an issue, please advise us how we can find information about what closures are occurring and the length of time streets will

> be closed so we can assess whether a particular closed street would accommodate
> our message.  Please also advise us if it is possible to request a street closure to
> accommodate a street painting, as we asked in our June 15th email.  Finally,
> please advise us if 16th Street NW is closed to accommodate the street painting in
> place there currently, how long the current painting will remain in place, and if
> the street will remain closed after the current painting is removed.  Obviously, if
> 16th Street NW is the only closed street available for street painting,
> accommodation should be made for other messages, including ours.

*Id.*, para. 16.  Later that same day, the Deputy Mayor responded as follows: "Thanks for circling

back.  Here is the best page to find information about public space permits: https://ddot.dc.gov/

page/public-space-permit-applications."  *Id.*, para. 17.

Plaintiff had reviewed this same webpage before submitting its request and determined

that the page contained no relevant information about processes or procedures for requesting a

permit for street painting.  *Id.*, para. 18.  Accordingly, it replied that same day, "Yes, but this

does not appear to address street painting.  *Id.*  It also does not appear that there is any current

permit for the street painting on 16th Street between H and K Streets."  *Id.*

By June 23, 2020, Plaintiff still had not received a response to its request and had

received no further communication from the Deputy Mayor.  *Id.*, para. 19.  Accordingly, it wrote

to the Deputy Mayor on that date:

> It will soon be more than three weeks since a team of artists, residents, district
> employees, and demonstrators were allowed to paint "Black Lives Matter" on
> 16th Street NW near the White House and other demonstrators painted "Defund
> the Police" next to "Black Lives Matter."  It also will soon be two weeks since we
> requested permission to paint our message – "Because No One Is Above the
> Law!" – on Independence Avenue SW.  We still have not received a response to
> our request.  We find it significant that the streets around 16th Street reopened
> nearly a week ago, as has Lafayette Square.  We have been unable to identify any
> particular reason why 16th Street remains closed other than to accommodate the
> two street paintings.  We also have not been able to identify a policy or procedure
> for requesting a permit to paint a message on a street or a policy or procedure for
> closing a street to accommodate a street painting.  Nor have we been able to
> determine whether closing a street is necessary to accommodate a street painting.

We have asked you for information on these subjects, but none was provided. The link to the Department of Transportation's permit webpage you sent us was unhelpful, as we advised you. We do not seek hold a parade or install a banner or seasonal display on a streetlight. We also do not seek to operate a sidewalk cafe, hold a block party, place a portable sign in a public space, or install electrical wiring. None of the types of permits referenced on the webpage apply to our request or to the paintings currently on 16th Street. Also based on the link you sent us, there does not appear to be any permit for the two messages on 16th Street.

We would gladly follow the rules if there were any. We are left with the firm conviction that the process – to the extent there is one – is arbitrary and favors only one viewpoint, that which is currently being expressed on 16th Street.

As you are probably aware, viewpoint discrimination violates the First Amendment no matter what type of forum is at issue. The timeliness of protected expression also is important. "It is vital to the operation of democratic government that the citizens have facts and ideas on important issues before them. A delay of even a day or two may be of crucial importance in some instances." *Carroll v. President & Comm'rs of Princess Anne*, 393 U.S. 175, 182 (1968) (internal quotation omitted).

We have been patient. We also have been flexible. We have stated our willingness to paint our motto at a different location if street closure is necessary and the City is unwilling to close our chosen location. All we ask is that we be afforded the same opportunity to paint our message on a DC street that has been afforded the painters on 16th Street. We request that opportunity be afforded to us within the next 48 hours. If we do not hear from you or if you once again fail to provide us with information about the appropriate process, we will have no choice but to evaluate our next steps, which may include litigation.

*Id.* Later that same day, the Deputy Mayor sent Plaintiff the following response: "Thank you for circling back. Days ago, I sent the information for how to apply for a public space permit. Here is the best page to find information about public space permits: https://ddot.dc.gov/page/public-space-permit-applications." *Id.*, para. 20. The webpage was the same webpage the Deputy Mayor had sent Plaintiff on June 18, 2020 and which Plaintiff had reviewed at least twice and determined that it contained no relevant information about processes or procedures for requesting a permit for street painting. *Id.*

On June 24, 2020, Plaintiff contacted the District Department of Transportation's Permitting Office directly, by telephone, to inquire about obtaining a permit. *Id.*, para. 21. The customer service representative who answered the call stated that she "was not sure we have a permit like that" and had "never heard of that." *Id.* She transferred the call to another individual in the Permit Office, but the transfer was not answered. *Id.* Plaintiff called back and spoke to a second customer service representative, who told Plaintiff he had "never seen that" type of permit. *Id.* The second representative recommended Plaintiff email the District Department of Transportation's Public Space Permit Manager, Mr. Elliott Garrett. *Id.*

Plaintiff did as recommended, forwarding to Mr. Garrett on June 25, 2020 its June 10, 2020 request and its earlier communications with the Deputy Mayor, explaining:

> Judicial Watch, Inc. has been communicating with Interim Deputy Mayor Falcicchio about our June 10 request to paint an expressive message on a District street, as has occurred on 16th Street NW. We initially proposed Independence Ave. SW, near our offices on 3rd Street SW, but are open to an alternate location. Copies of our June 10 request and our communications with Interim Deputy Mayor Falcicchio are attached.
>
> We've reviewed the public space permit application webpage multiple times and have not been able to identify any process or procedure concerning street painting. I also spoke with the Permitting Center, and it was recommended that we email you. Any assistance you can provide would be appreciated.

*Id.*, para. 22. Plaintiff never received a response from Mr. Garrett or anyone else at the Department of Transportation. *Id.* Plaintiff still has not heard from Mr. Garrett.

Also as the date of the Complaint, neither the Mayor, the Deputy Mayor, nor the Director of Transportation Jeffrey Martoonian had responded substantively to Plaintiff's request. *Id.*, para. 23. Plaintiff still has not receive a substantive response to its request.

By failing to respond in a timely manner, Defendants effectively denied Plaintiff's request. *Id.* On information and belief, no permit was requested or issued for "Black Lives

Matter" or "Defund the Police." *Id.*, para. 24.  Defendants now admit that there is no permit to

paint an expressive message on a District street.  Defs' Mot. at 4.  They offer no reason for why

the Deputy Mayor misled Plaintiff about the existence of a permit process.  Nor do they offer a

reason why the activists who painted "Black Lives Matter" and "Defund the Police" did not

require a permit.  Complaint, paras. 7, 8, and 24.

Additionally, although Defendants are coy about their position on defunding the police,

the Mayor's proposed budget for Fiscal Year 2021 eliminates any doubt.  On May 18, 2020, she

submitted a proposed budget to the Council that would have *increased* the budget of the

Metropolitan Police Department ("MPD") by $17.5 million, to $578 million.  *See* May 18, 2020

Transmittal Letter from District Chief Financial Officer Jeffery S. DeWitt, attached as Exhibit 1,

at 5.  According to the Mayor's proposed budget, the "$17.5 million over FY 2020 is primarily

attributed to additional support of the Patrol Services bureau, which will afford MPD the ability

to coordinate crime prevention and reduction efforts in the seven police districts."  *Id.*  On July

28, 2020, by which point "Defund the Police" had been on display for nearly two months, the

Council approved an $568 million budget for the MPD, not everything the Mayor had requested,

but still an *increase* over the FY 2020 budget of $559 million.  *See* Martin Austermuhle,

"Protesters Call on the DC Council to 'Defund the Police.  Did that actually happen?" *DCist*

(July 10, 2020) (available at https://dcist.com/story/20/07/10/protesters-called-on-the-d-c-

council-to-defund-the-police-did-that-actually-happen/) (visited Aug. 18, 2020).

Since Plaintiff filed suit, the portion of 16th Street on which "Black Lives Matter" and

"Defund the Police" was painted has been used for any number of public gatherings.  These

include yoga classes and even "movie night," as the following photographs show:



*See* https://www.washingtonian.com/2020/07/27/why-organizers-think-its-ok-to-host-yoga-class-

at-black-lives-matter-plaza/ (visited Aug. 18, 2020).



*See* https://www.instagram.com/p/CDzhN7IhNV1/ (visited Aug. 18, 2020).

Plaintiff also has learned that, since it filed suit, the Mayor, through counsel, responded to another organization seeking to a paint an expressive message on a DC street but, unlike with respect to Plaintiff's request, identified two processes for doing so.  In a July 29, 2020 letter, the Mayor's counsel told the organization that, in order to paint an expressive message on a DC street, the organization would first have to seek approval to close the street on which the message was to be painted by obtaining either a block party or a special event permit.  *See* July 29, 2020 Letter from Mayor's Office of Legal Counsel, attached as Exhibit 2.  According to the Mayor's counsel, obtaining a block party permit would require petitioning and obtaining the consent of at least 50 percent of the neighbors on the affected block and the approval of the District Department of Transportation, among other conditions.  *Id.*  Alternatively, a special event permit

could be obtained by "apply[ing] through the Mayor's Special Event Task Group, which includes the Department of Consumer and Regulatory Affairs, Metropolitan Police Department, Executive Office of the Mayor, Department of Public Works, and Federal Government stakeholders." *Id.* No specifics on how to go about submitting such an application were provided. *Id.* The letter concludes, "unless a street is closed and a permit is approved, a private citizen may not paint a mural on a District roadway." *Id.*

This same letter also claims that the Mayor had "Black Lives Matter" painted on 16th Street "pursuant to authority to commission, install, and promote public artwork in the public right of way," citing 10 DCMR § A1406.AC-2.1. Exhibit 2. To Plaintiff's knowledge, this letter is the first time the Mayor has identified any authority by which she purportedly ordered the street painting. The regulation she identifies, however, does not mention the Mayor nor gives her authority to do anything. 10 DCMR § A1406.AC-2. l. Its language is merely precatory and seeks to promote increased opportunities for public art. *Id.*

On August 1, 2020, two protesters were arrested in the District for attempting to write "Pre-Born Black Lives Matter" in chalk on a District sidewalk. *See* Emily Davis, "Two Anti-Abortion Activists Arrested at Protest," *Washington Post* (Aug. 2, 2020), attached as Exhibit 3. According to reports, the protesters originally wanted to paint "Pre-Born Black Lives Matter" on a District street and sought and were granted a permit from the MPD. *Id.* The group claimed police told them they would not be prevented from writing their message on the street. *Id.* On the morning of the protest, police told them they would not be allowed to paint on the street, and when they instead started to chalk their message on the sidewalk, they were arrested for allegedly violating the District's anti-defacement statute. *Id.*

On August 11, 2020, only a few days before the Mayor addressed the Democratic
National Convention from a roof top terrace overlooking 16th Street, with "Black Lives Matter"
in the background, a construction crew paved over "Defund the Police," purportedly as part of
previously planned road work scheduled to be completed a year earlier.  *See* Mark Bist, "City
Says 'Defund the Police Message' at BLM Plaza Was Erased Due to Road Work," *DCist* (Aug.
17, 2020) (available at https://dcist.com/story/20/08/17/dc-defund-police-black-lives-matter-
plaza-mural/ (visited Aug. 17, 2020).

**III.   ARGUMENT.**

    A.   <u>Legal Standards</u>.

In *Stewart v. D.C. Armory Bd.*, 863 F.2d 1013 (D.C. Cir. 1988), the DC Circuit reversed
the granting of a Rule 12(b)(6) motion in a First Amendment challenge to limitations on speech
at RFK Stadium.  The primary issue in *Stewart* was whether the stadium was a public forum such
that the plaintiff could hang a banner quoting a bible verse – John 3:16 – from a railing in the
stands during televised football games.  In reversing the dismissal, the Court found the forum
analysis was inherently factual: "The public forum doctrine as explained by the Supreme Court
indicates that the inquiry into the nature of a forum raises factual issues about policy and
practices in ascertaining the government's intent." *Stewart*, 863 F.2d at 1021.  It also declared,
"[W]here government action is challenged on first amendment grounds, a court should be
especially 'unwilling to decide the legal questions posed by the parties without a more
thoroughly developed record of proceedings in which the parties have an opportunity to prove
those disputed factual assertions upon which they rely.'" *Id.* at 1017-18 (*quoting City of Los
Angeles v. Preferred Commc'ns*, 476 U.S. 488, 494 (1986)).

The same is true here, although in addition to the forum analysis issue, Defendants also raise the issue of governments speech.  There is no principled reason why the outcome should be any different in the context of government speech.  Whether the issue is forum analysis or government speech, the inquiry is inherently factual and a fully developed factual record is required before a court can decide either issue.  Notwithstanding Defendants' government speech and forum analysis arguments, Plaintiff's complaint contains ample facts that state a plausible claim for violation of Plaintiff's First Amendment rights.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Defendants fail to show beyond doubt that Plaintiff can prove no set of facts in support of its claim that would entitle Plaintiff to relief.  *See*, *e.g.*, *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997) (*citing Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)).  They also ignore both the *Stewart* standard and the standard governing what materials the Court may consider in evaluating a complaint.  *Id.*  Their motion is filled with references to materials outside the four corners of the complaint.  Defendants did not ask the Court to take judicial notice of these materials nor did they establish that judicial notice would be proper.  The Court should disregard them.

Because Defendants go so far beyond the four corners of the complaint, Plaintiff is compelled to respond.  Plaintiff therefore asks the Court take judicial notice of the following, all of which readily satisfy the requirements for judicial notice:

1. Mayor Bowser's Fiscal Year 2021 Proposed Budget and, in particular, the May 18, 2020 transmittal letter from Chief Financial Officer Jeffrey S. DeWitt and its contents.[1]

---

[1]    The full proposed budget is available at https://cfo.dc.gov/sites/default/files/dc/sites/ocfo/

2.      The District's Fiscal Year 2021 Budget increases spending on police over

the Fiscal Year 2020 Budget.

3.      The June 29, 2020 letter from the Mayor's Office of Legal Counsel to

Cmdr. John B. Wells and its contents.

4.      The fact of the August 1, 2020 arrest of two protesters attempting to write

an expressive message on a District sidewalk.

5.      The fact that the portion of 16th Street on which "Black Lives Matter" and

"Defund the Police" was painted is used for any number of public

gatherings.

The Court may take judicial notice of these materials and facts, which are not subject to

reasonable dispute because they are generally known within the Court's territorial jurisdiction or

can be accurately and readily determined from sources whose accuracy cannot reasonably be

questioned.  Fed. R. Evid. 201(b).

At a minimum, discovery is necessary to answer the myriad factual questions

Defendants' actions raise, including whether the Mayor directed or District commissioned the

painting of "Black Lives Matter" on 16th Street, as Defendants' motion claims, and why

"Defund the Police" was allowed to remain next to "Black Lives Matter" for more than nine

weeks.  Defendants admit that the protesters who painted "Defund the Police" next to "Black

Lives Matter" did so without permission.  Doing so violated the District's anti-defacement

statute and was a crime.  So why was no action taken against the perpetrators and why was this

key demand of the "Black Lives Matter" movement allowed to remain on the street for so long?

At least two blocks of 16th Street have been closed to vehicular traffic since the messages were

---

publication/attachments/DC_OCFO_2021_Budget_Vol_1.pdf.

created and remain closed.  Pursuant to what authority was 16th Street closed and for what

reason?  It is to accommodate the "Black Lives Matter" and "Defund the Police" messages?

Answering these and other questions is necessary to decide the merits of this case.

  B. <u>No Government Speech</u>.

  Defendants' claim that "Black Lives Matter" and "Defund the Police" are "government

speech" is a legal conclusion, not a factual assertion.[2]  It also is a legal conclusion that is heavily

fact dependent, and Plaintiff's complaint does not allege facts from which the Court could

conclude that "Black Lives Matter" and "Defund the Police" are government speech.  Plaintiff

alleged that a "team of artists, residents, District employees, and demonstrators" painted "Black

Lives Matter" and that "protesters" painted "Defund the Police" next to it.  Compl., paras. 7 and

8.  This allegation came directly from a video the Mayor posted on her official twitter account on

June 12, 2020.[3]  The video makes no claim that the Mayor directed that "Black Lives Matter" be

painted or that the District commissioned the message.  It also shows a great number of

individuals, many of whom look like private citizens and even children, painting "Black Lives

Matter" on the street.  While Plaintiff also alleged that the Mayor "approved and supports"

"Black Lives Matter" and "either approved or acquiesced" to "Defund the Police" (Compl., para.

10), neither allegation is sufficient to conclude that the allegations in the complaint supports a

finding that the messages are government speech, especially where all factual inferences are to

---

[2] Defendants' government speech argument is a tacit admission that it engaged in viewpoint discrimination.  Defs' Mot. at 10-19.  By arguing government speech, Defendants admit that they treated speech differently based on its content.

[3] *See* https://twitter.com/MayorBowser/status/1271511674961436672?s=19 (last visited August 17, 2020) at 1:25.  According to this same video, the closed portion of 16th Street where the messages were painted is "a place for healing, strategizing, protest, and redress."  *Id.* at 1:54.  In other words, it is a classic public forum.

be drawn in Plaintiff's favor.  One can approve and support something without having caused its creation, commissioned it, or otherwise directed that it be done.

The version of the facts alleged by Defendants in their motion to dismiss differs from the facts alleged in the complaint.  Defendants claim "Black Lives Matter" was painted "at Mayor Bowser's direction" in response to actions by President Trump.  Defs' Mot. at 5-6.  They also claim, incongruously, it was "commissioned by the District for public display."  *Id.* at 12. Defendants euphemistically assert that "Defund the Police" was "privately contributed," but later admit that it was painted without permission (*i.e.*, "grafitti").  *Id.* at 12 and 17.

Obviously, the Court must consider the facts alleged in the complaint, and those facts do not yield a legal conclusion that either message is government speech.  If anything, making this determination requires factual development not appropriate on a motion to dismiss.  *Stewart*, 863 F.2d at 1017-18, 1021.  Who were the artists, residents, and protestors who participated in painting "Black Lives Matter"?  Did these artist, residents, and protesters request or coordinate involvement by the District, or did the District request or coordinate their involvement?  Who paid for the design and layout and the paint, buckets, and brushes?  To the extent district employees were involved, were they acting in the course of their employment or did they volunteer?  Who coordinated the painting and the street closure, and was the street closed to accommodate the painting or did the individuals who painted the message take advantage of the fact that the street was already closed?  If "Black Lives Matter" was "commissioned" by the District as Defendants claim, what were the facts and circumstances of this alleged commissioning and what was the Mayor's involvement?  What, if anything, distinguishes "Defund the Police" from "privately contributed" messages spray painted by protesters elsewhere in the District, including on the steps of the Lincoln Memorial, the World War II

Memorial, and the statue of General Casimir Pulaski?  *See* "Lincoln Memorial, WWII Memorial

Defaced by Vandals During Rioting," *Washington Times* (June 1, 2020) (available at

https://www.washingtontimes.com/news/2020/jun/1/lincoln-memorial-wwii-memorial-defaced-

vandals-rio/) (visited Aug. 18. 2020).  These and a myriad of other questions must be answered

before any determination can be made about government speech.

As a legal matter, Defendants fail to identify any case clearly defining what government

speech is.  Plaintiff has found none.  No case appears to have applied the "government speech"

doctrine in the context of street painting – let alone the painting of political messages on city

streets.  In *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009), it was applied to fifteen stone

monuments displayed in a city park, some of which had been in place for more than thirty years

before the plaintiff filed suit.  The monuments did not appear overnight at a location previously

used for a different purpose.  In *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576

U.S. 200 (2015), it was applied to the "assortment" of specialty license plates the Texas

Department of Motor Vehicles offers to drivers, the design of which Texas had selected through

three distinct processes.  In the various DC cases considering the issue, it has been applied to the

selection of portraits for the National Portrait Gallery, the display in the U.S. Capitol Complex of

student artwork chosen to represent House districts in the annual Congressional Art Competition,

and seating set aside for the Presidential Inaugural Committee along the Presidential Inaugural

Parade route.  *Raven v Sajet*, 334 F. Supp.3d 22 (D.D.C. 2018) *aff'd sub nom. Raven v. United

States*, 2019 U.S. App. LEXIS 14849 (D.C. Cir. May 17, 2019); *Pulphus v. Ayers*, 249 F.

Supp.3d 238 (D.D.C. 2017); *A.N.S.W.E.R. Coal. v. Jewell*, 153 F. Supp.3d 395 (D.D.C. 2016).  It

also has been applied to some 200 animal sculptures (elephants and donkeys) that artists were

invited to decorate for display across the District as part of a special art project sponsored by the

District's Commission on the Arts and Humanities and to a workplace notice that the U.S. Department of Labor requires federal contractors to post. *People for the Ethical Treatment of Animals, Inc. v. Gittens*, 414 F.3d 23 (D.C. Cir. 2005); *Nat'l Ass'n of Mfrs. v. Perez*, 103 F. Supp.3d 7 (D.D.C. 2015). In *Nat'l Ass'n of Mfrs.*, the Court noted, "The government-speech doctrine is a relatively recent development in federal case law and the test to determine if something is an example of government speech has not been clearly established." 103 F. Supp.3d at 15, n.4. In *Pulphus*, the Court described the government speech doctrine as "still evolving." 249 F. Supp.3d at 238. No case has analyzed how the addition of private speech – especially unauthorized or illegal private speech – affects claimed government speech.

In support of their government speech argument, Defendants claim that "Black Lives Matter" and "Defund the Police" are art and that they can choose to display or reject whatever artwork they like without regard to the First Amendment. But Plaintiff has not alleged that the messages are art. Nor is 16th Street a museum or a location where art has ever been displayed, even temporarily. The messages also are undeniably political expressions, not artistic ones. "Black Lives Matter" is the name of an organized movement and a globally recognized exhortation. "Defund the Police" is a principle demand of the Black Lives Matter movement. To assert that the two messages are works of art like a portrait, painting, decorated elephant, or anything else that other courts have deemed government speech ignores the inherently political nature of both messages. "Black Lives Matter" and "Defund the Police" are nothing like what was at issue in any government speech case Defendants cite or Plaintiff has been able to identify. If protesters had painted "Make America Great Again" on 16th Street instead of "Defund the Police" and Defendants did not remove it, would it be government speech under existing precedent or a violation of the District's anti-defacement statute? As Justice Alito, the author of

*Summum* cautioned in his dissent in *Walker,* an expansive reading of the government speech

doctrine threatens private speech that the government finds displeasing.  *Walker*, 576 U.S. at 221

(Alito, J., dissenting).

To the extent Defendants attribute "Black Lives Matter" to the Mayor, it would appear to

be her message, not the official position of the District.[4]  Defendants make no claim that the

Council reviewed and approved "Black Lives Matter" before or after it was painted on the street.

They do not explain what they mean when they claim the District "commissioned" the message.

Defendants also do not offer a single case in which a statement that was so obviously politically

if not personally motivated was held to be government speech.  Nonetheless, "[t]he involvement

of public officials in advocacy may be limited by law, regulation, or practice."  *Summum*, 555

U.S. at 468.  Defendants' motion cites no law or regulation authorizing the Mayor to paint

political messages on District streets, and the authority cited by the Mayor's Office of Legal

Counsel in the June 29, 2020 letter to the veterans organization says no such thing.  *See* Exhibit 2

(*citing* 10 DCMR § A1406.AC-2.1).  Defendants also identify no legal authority granting the

Mayor power to close 16th Street – and keep it closed for more than nine weeks, if not

permanently – to accommodate a political message painted on the street.[5]  District law contains

various provisions for shutting down streets, but the Mayor does not appear to have followed

them.  *See, e.g.*, D.C. Code §§ 9-202.01 *et seq.* (street closures) and 9-631 *et seq.* (temporary

closures for block parties); 24 DCMR § 1400 *et. seq.* (street closures).  It would be incongruous

---

[4]     Of course, Plaintiff does not allege that the Mayor directed the message be painted on
16th Street.  Defendants' memorandum makes that claim and asserts that the Mayor directed the
painting of "Black Lives Matter" as a response to President Trump.  Defs' Mot. at 5-6.

[5]     The absence of any authority is particularly significant given that the Mayor apparently
intends "Black Lives Matter" to be permanent.  According to Defendants, the Mayor told a
reporter, "Like all our other public art, it stays."  Defs' Mot. at 7.

for the message to be government speech when it is at odds with the District's own laws.

Defendants certainly cite no case finding that government action not undertaken according to

lawful government process was nonetheless government speech.

Regarding "Defund the Police," a government entity may receive assistance from private

sources to deliver a government-controlled message or may compile the expressive works of

others for a governmental purpose. *Summum*, 555 U.S. at 468; *Gittens*, 415 F.3d at 28.  The

notion that protesters "privately contributed" "Defund the Police" to 16th Street is disingenuous.

*See* Defs' Mot. at 12.  Plaintiff does not allege and Defendants make no claim that "Defund the

Police" was painted on 16th Street as part of some government-controlled message and that they

asked protesters to assist them in painting it.  Rather, Defendants admit that protesters painted

the message on their own, without authorization or permission.  Defs' Mot. at 17.  Writing,

marking, drawing, or painting any word, sign, or figure on public property in the District,

without permission, is a crime.  *See* D.C. Code § 22-3312.01; *see also Mahoney v. Doe*, 642 F.3d

1112 (D.C. Cir. 2011) (upholding constitutionality of the District's defacement statute

challenged by protester who attempted to chalk pro-life message on Pennsylvania Avenue).  Far

from assisting Defendants with delivering a governmental message, the protesters could have

been arrested.  *Id.*  Of course, there could be factual questions about whether Defendants knew

about the protesters' plans before "Defund the Police" was painted next to "Black Lives Matter"

and whether Defendants cooperated, assisted, or facilitated the painting of the second message.

These and many other factual issues are outside the scope of any motion to dismiss.

Defendants also cannot argue that "Defund the Police" is part of a compilation of

messages selected for display on 16th Street.  *Gittens*, 415 F.3d at 28.  Not only does Plaintiff not

allege Defendants "compiled" "Black Lives Matter" and "Defund the Police" on 16th Street for

display to the public (*see* Compl., para. 8), the polar opposite is the case.  Defendants admit

protesters added "Defund the Police" to "Black Lives Matter" without permission from the

District.  Defs' Mot. at 17.  Even if Defendants had "compiled" the two messages, Plaintiff did

not plead and Defendants have not asserted any governmental purpose for doing so.  Defendants

also do not cite any case in which such circumstances were found to constitute a compilation of

expressive works under the government speech doctrine.

Clearly, the facts alleged in the Complaint do not show "Black Lives Matter" and

"Defund the Police," individually or collectively, are government speech.  At a minimum,

additional factual development is necessary to decide the question, which makes it inappropriate

to decide on a motion to dismiss.  *Stewart*, 863 F.2d at 1017-18, 1021.  It also is clear, however,

that Defendants' government speech argument cannot withstand the three-factor analysis laid out

in *Walker* and *Summum*:  (1) whether the medium at issue has historically been used to

communicate messages from the government; (2) whether the public reasonably interprets the

government to be the speaker; and (3) whether the government maintains editorial control over

the speech.  *Pulphus*, 249 F. Supp.3d at 247 (*citing Walker*, 576 U.S. at 209-10 and *Summum*,

555 U.S. at 470-72).

1.    Street Painting Has Never Been Used for Government Speech.

Defendants do not identify a single historical example of the District or any government

using street painting to communicate a message to the public.[6]  Their claim that pavement

markings constitute government speech falls flat.  Crosswalks, lane dividers, and turn arrows are

standardized traffic regulations established by District law and the Federal Highway

---

[6]    The Mayor's video describes it as "the first of its kind."  *See* https://twitter.com/
MayorBowser/status/1271511674961436672?s=19 (last visited August 17, 2020) at 1:25.

Administration's Manual on Uniform Traffic Control Devices ("MUTCD").  *See* 18 DCMR §

2100.2.  Disobeying them is an offense.  *See*, *e.g.*, *id.* §§ 2201.8 (lane violation); 2203.11 (turn

violation); 2405.1(b) (crosswalk violation).  No reasonable person would equate a double solid

yellow line or "KEEP CLEAR" in all white capital letters with a message from the government.

MUTCD-approved pavement markings are no more government speech than are stop signs and

traffic lights.  Nor would painting any MUTCD-approved pavement marking on the surface of

16th Street have generated nationwide, if not international, media attention.  It drew attention

because it was unique; it was the first-time street painting had ever been used for expressive

purposes.  This factor weighs heavily in favor of finding no government speech.

        2.      The Public Does Not Reasonably Interpret the District
                  <u>to Be the Speaker</u>.

      Defendants speculate that the public would reasonably interpret "Black Lives Matter"

and "Defund the Police" to be the District's speech, again analogizing the messages to art

compiled for exhibition in a government-run art gallery.  Defs' at Mot. 16.  More likely,

however, is that the public would reasonably identify "Black Lives Matter" with the well-known

political movement of that same name and "Defund the Police" as a key demand of that

movement.  No observer is reasonably likely to mistake "Defund the Police" with the District.

This is especially the case given that neither the Mayor nor the Council support defunding the

MPD, as demonstrated by the District's recently adopted FY 2021 budget.

      Nothing about either message informs the viewer or otherwise declares that the speaker is

the Mayor or the District.  Plaintiff has not alleged and Defendants do not claim that a sign or

other marker either advises viewers or disclaims that the messages expressed on the street are

endorsed or sponsored by or reflect the views of the Mayor or the District.  *Cf.*, *Pulphus*, 249 F.

Supp.3d at 250 (artwork of winners of Congressional Art Competition hanging in the Capitol

Complex was labeled with the sponsoring Member's name).  The viewer is left to draw his or her

own conclusion.  While Plaintiff alleges that the District's crest also is painted on the street, any

reasonable viewer would know that neither the Mayor nor the District have exclusive control

over that ubiquitous symbol, which is displayed on public and private property throughout the

District.  It is as much a designation of location as anything.  If the U.S. Flag had been painted on

the street alongside "Black Lives Matter" and "Defund the Police," no viewer would reasonably

conclude as a result that the messages were the speech of the United States government.

A street also is not an art gallery.  Nor is 16th Street "closely identified in the public

mind" with the District's government.  *Cf.*, *A.N.S.W.E.R. Coal.*, 153 F. Supp.3d at 412.  Unlike

art galleries, streets are traditional public fora.[7]  They are commonly used for expressive activity.

Even if painting a political message on a street might be a new form of expressive activity, there

is nothing inherent in a street painting that would lead a viewer to reasonably conclude that the

message is that of the government.  Street painting is no different from a street protest or

demonstration in this regard.  Americans understand that streets are used for expressive activity,

that local governments issue permits for or may allow expressive activity on streets, and that,

permitted or unpermitted, expressive activity on a street does not mean the government has

endorsed, sponsored, or approved whatever message is being expressed.  No viewer would

reasonably conclude that a protest or demonstration carried out on a District street is the

District's speech.  The same is true for street paintings.  Given streets' status as traditional public

fora, it is not reasonably likely that a viewer would consider a political message painted on a

---

[7]     While parks may be traditional public fora as well, this case is distinctly different from
*Summum*.  Unlike in *Summum*, in which the plaintiff requested and was denied permission to
install a monument in a city park, the protesters who painted "Defund the Police" neither
requested nor received permission from the District, yet the District took no action.

District street to be the District's speech.  *Cf. Pulphus*, 249 F. Supp.3d at 249 (distinguishing the tunnel between the Cannon House Office Building and the Capitol from a traditional public forum for purposes of assessing whether the public would reasonably interpret winning entries in Congressional Art Competition as Congress' speech).

Defendants argue that Plaintiff somehow acknowledged that "Black Lives Matter" and "Defund the Police" could reasonably be viewed as government speech.  Defs' Mot. at 16 (*quoting* Compl., para. 10).  But again, Defendants confuse approving or acquiescing in the painting of the messages with creating or sponsoring them, causing them to be painted, or adopting or agreeing with the substance of the messages.  A government official or any private individual can express approval or support for something without having caused it to happen.  Likewise, approval by a government official does not signal that the government has adopted or is in agreement with the underlying speech or create or sponsors the speech.  If persons opposed to DC statehood seek a permit to hold a rally outside the District Building, the approval of the permit could not reasonably be interpreted as the District creating or sponsoring the rally or adopting or agreeing with the views expressed at the rally.

Finally, Defendants cite only a single case, *Raven v. Sajet*, *supra*, in support of their argument regarding this second factor of the government speech analysis.  But the messages painted on 16th Street are nothing like the portraits, either in content, location, or number, hanging in the National Portrait Gallery.  Again, "Black Lives Matter" and "Defund the Police" are the name of an internationally recognized political movement and a key demand of that movement.  A viewer looking at the messages on 16th Street would not think that the Mayor or some other District official "consider [them] worthy of consideration and selected [them] for display" in the same sense that the National Portrait Gallery choses what portraits to exhibit.

Defs' Mot. at 16.  If is far more likely that a reasonable viewer would conclude that Black Lives
Matter either received permission to paint its name and one of its key demands on 16th Street or
did so without permission.  At a minimum, it is premature to make any such assessment on a
motion to dismiss.

> 3. <u>The District Did Not Maintain Editorial Control</u>.

Defendants' "editorial control" argument rests on the factual assertion that "Black Lives
Matter" was "painted at the direction of the Mayor's office, organized by a District agency, and
painted by artists commissioned by the government and members of the community."  Defs'
Mot. at 17.  Again, that is not what the Complaint alleges.  The Complaint alleges that "[i]n the
early morning hours of Friday, June 5, 2020, a team of artists, residents, District employees, and
demonstrators painted "Black Lives Matter" on 16th Street NW."  Compl. para. 7.  The exact
circumstances of how "Black Lives Matter" came to be painted on 16th Street obviously will be
an issue in this litigation.  At the motion to dismiss stage, however, Defendants' alternative
factual claims are improper and raise more questions then they answer. *St. Francis Xavier
Parochial Sch.*, 117 F.3d at 624.

As Defendants correctly point out, however, the Complaint also alleges that the protesters
who painted "Defund the Police" next to "Black Lives Matter" also painted over the three stars
in the District's crest and, the following day, District Department of Public Works employees
repainted the stars.  Compl., para. 9.  Defendants' argument that repainting the stars shows
editorial control over the messages overstates the matter by far.  Repainting three stars on
messages that span two city blocks hardly constitutes exercising editorial control.  This is
especially the case because the protesters painted "Defund the Police" without permission,

substantially changing the nature of the original message.[8]  In addition to being the name of a political movement, "Black Lives Matter" had become a fairly commonplace, anodyne exhortation.  By adding "Defund the Police," a key demand of the Black Lives Matter movement, the protesters refocused the original message onto the Black Lives Matter movement and its agenda.  They also did so without seeking a permit or other authorization from the District, conduct that plainly violates District law.   *See* D.C. Code § 22-3312.01.  Under the circumstances, allowing this unlawful activity to occur and failing to remedy it is the opposite of exercising editorial control.  To exercise editorial control, Defendants would have had to remove "Defund the Police" from the street the day it was painted.  Anything less is a lawyer's pretense of editorial control.

It also is nothing like what other courts have considered editorial control.  In nearly all if not all cases the parties have cited, the government had processes and procedures in place for the submission and selection of what was to be displayed.[9]  None concerned a completely new medium like street painting for which where was no preexisting application, submission, and evaluation process, and none included an unauthorized or illegal addition that substantially changed a preexisting display.  Both *Walker*, which concerned the selection of specialty license plate designs and in *Summum*, which concerned the selection of monuments for a city park, had such processes in place.  *Walker*, 576 U.S. at 204-05; *Summum*, 555 U.S. at 464-65.  In *Raven*, the Court found that the National Portrait Gallery exercised editorial control over the portraits

---

[8]     Even with the stars being repainted, a viewer could still reasonably understand the District crest between "Black Lives Matter" and "Defund the Police" to be an "equals" sign.

[9]     *A.N.S.W.E.R. Coal.* must be treated differently because it did not concern the display of messages or artwork but instead concerned a government set aside of space along presidential inaugural parade route for the Presidential Inaugural Committee.  As such, it found the case warranted a different analysis.  153 F. Supp.3d at 412-13.

exhibited in the museum by exercising "expansive authority" to accept a portrait "on the basis of its general historical interest, its artistic merit, or the historical significance of the individual to which it relates, or any combination of any such factors."  334 F. Supp.3d at 32 (*quoting* 20 U.S.C. § 75e(1)).  Likewise, in *Pulphus*, the Architect of the Capitol had extensive practices and procedures in place for selecting the winners of the art competition at issue and for displaying their art.  249 F. Supp.3d at 252-53.  Similarly, in *Gittens*, the Court found that the District Commission on the Arts and Humanities exercised editorial control over the "Party Animals" project because the commission decided which decorated donkeys and elephants to display and which to reject.  414 F.3d at 28.

Obviously, this case concerns expressive messages, not the selection of works of art for display in a museum or other specific location, or as part of a special project.  There was no preexisting selection process.  The painting of "Black Lives Matter" appears to have been undertaken in an ad hoc manner, and the painting of "Defund the Police" was an illegal act that violated the District's anti-defacement statute.  Regardless, Defendants plainly did not exercise editorial control over the message being displayed because the protesters who painted "Defund the Police" fundamentally changed the original message and Defendants did nothing about it.  Like with the other two factors, the "editorial control" factor weighs heavily in favor of finding no government speech.

In sum, the facts alleged in the Complaint do not support a finding that "Black Lives Matter" and "Defund the Police," individually or collectively, are government speech.  At a minimum, it is premature to decide the issue.  Additional factual development and discovery are necessary before the Court can adjudicate Defendants' government speech argument.  Either way, the motion to dismiss on the grounds of the government speech doctrine must be rejected.

C.     Forum Analysis.

There are three steps to analyzing a First Amendment claim: "first, determining whether the First Amendment protects the speech at issue, then identifying the nature of the forum, and finally assessing whether the [government's] justifications for restricting [Plaintiff's] speech satisfy the requisite standard." *Mahoney*, 642 F.3d at 1116 (*citing Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985)).  It is undisputed that Plaintiff's message is private speech protected under the First Amendment.  Therefore, the analysis turns to determining the nature of the forum before examining Defendants' conduct.

The Supreme Court has identified general categories of government-controlled property for First Amendment purposes:  traditional public forums, designated public forums, and nonpublic forums.  *Mahoney*, 642 F.3d at 1116-17; *see also Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 322 (D.C. Cir. 2018).  Traditional public forums are those places which by long tradition or by government fiat have been devoted to assembly and debate.  *Mahoney*, 642 F.3d at 1116 (internal quotations and citation omitted).  A designated public forum consists of public property which the state has opened for use by the public as a place for expressive activity.  *Id.* at 1117.  A nonpublic forum is by contradistinction public property which is not by tradition or designation a forum for public communication.  *Id.*  "[T]he decision as to whether a forum is public usually invokes a factual inquiry."  *Stewart*, 863 F.2d at 1018.  "The forum doctrine itself is not a taxonomy of ideal types; it is virtually impossible in most cases to identify a public forum by legal inquiry alone, confined to the intrinsic nature of government actions or purposes."  *Id.*

Not unlike in this case, the plaintiff in *Mahoney* sought to chalk expressive messages on the street in front of the White House – a street that was no longer open to automobiles but

remained open to pedestrians.[10]  *Mahoney*, 642 F.3d at 1117.  The DC Circuit held that District

streets are public fora.  *Id.*  That outcome controls here, especially with respect to the closed

portion of 16th Street, which" functions, for all practical purposes, as an extension of the

abutting sidewalk," a space that undoubtedly is a public forum.  *Id.*

       In *Mahoney*, the Court rejected as an "odd inversion" of the typical forum dispute the

District's argument that the street was "not a public forum when used as a 'writing tablet.'"  642

F.3d at 1117.  Defendants' argument here is a similarly "odd inversion" of the typical forum

dispute.  According to Defendants, forum designations depend on whether an expressive activity

is temporary or permanent.[11]  Defs' Mot. at 19-20.  Under Defendants' theory of the law, the

former describes public forums while the latter does not because permanent expressive activity

"monopolize the use of the land on which they stand and interfere permanently with the other

uses of the public space."  *Id*.  From this, Defendants leap to the conclusion that "murals are like

other permanent monuments in that they require physical removal to regain the use of the space

[…] and they interfere with the other uses of the street, like normal flow of traffic."  Defs' Mot.

at 20.  Defendants therefore conclude that District streets in general and 16th Street in particular

are not public forums for purposes of street paintings because street paintings are a type of

permanent monument.

---

[10]     Because Plaintiff's request for permission to paint its message was not limited to one location, but rather any road available in the District, open, closed, or open and subject to closure, the forum analysis must conclude that no District street is a public forum to render Plaintiff's claims implausible under Rule 12(b)(6).  *See* Compl., paras. 11, 14, 16, and 19.

[11]     Defendants' argument relies on *Summum*, which obviously is a government speech case, not a forum analysis case.  As such, Plaintiff submits that Defendants' "permanent vs. temporary" forum analysis is entirely misplaced and should be rejected for this reason alone.

First, there is no legal basis for Defendants' assertion that the permanence of expressive activity somehow bears on a forum analysis. Defendants' reliance on *Summum* for this proposition is misplaced because *Summum* was a government speech case, not a forum analysis case. Defendants confuse government speech analysis with forum analysis. Whether a location is a traditional public forum is not affected by whether the expressive activity at issue is temporary or permanent. Defendants' contrary argument is at odds with longstanding precedent. *See*, *e.g.*, *Cornelius*, 473 U.S. at 797 (describing three steps of First Amendment analysis). Rather, and like in *Mahoney*, Defendants appear to be arguing that one class of expression should not be allowed in a preexisting public forum. *Mahoney*, 642 F.3d at 1117. In *Mahoney* it was chalking; here, at least according to Defendants, it is "permanent" expressive activity in the form of street painting. While whether the expressive activity is temporary or permanent may bear on the propriety of a regulation of speech in a public forum – and Defendants have not identified any such regulation in District law – it has no bearing on forum analysis.[12] Defendants' argument that the nature of the expression determines the forum seemingly merges the forum analysis (second step) with assessing whether the government's justifications for restricting speech satisfy the requisite standard (third step) in analyzing a First Amendment violation. Defendants are just wrong on the law.

Second, there is no factual basis for Defendants' assertion that permanence is even at issue in this litigation. The complaint does not allege that Plaintiff seeks to have its message permanently displayed on 16th Street or any other District street. Plaintiff simply asks that it "be

---

[12]     It may bear on whether a particular location is a limited or designated public forum, but as the Court found in *Mahoney*, it is a distinction without a difference because the same legal standard applies when assessing limitations on speech in a traditional public forum or a limited or designated forum. *Mahoney*, 642 F.3d at 1117.

afforded the same opportunity to paint [its] message on a DC street that has been afforded the painters on 16th Street."  Compl., para. 19.  The permanency of Plaintiff's expressive conduct will be borne out during discovery.  Also misplaced is Defendants' bald contention that painted messages "interfere with the other use of the street, like the normal traffic flow" without accounting for the fact that traffic flows over painted streets – in the form of MUTCD-approved pavement markings – regularly.[13]  Defs' Mot. at 20.  Unlike a statue, monument, or sign, painted messages on street surfaces, like MUTCD-approved pavement markings, are flat; they present no physical obstacle.  Defendants also identify no facts that might support such a claim and ignore the fact that, not only is 16th Street closed, but the now car-free public space has hosted a variety of uses including yoga classes and movie nights.  Indeed, the Mayor's video describes the area as "a place for healing, strategizing, protest, and redress."  Such activities obviously can take place without regard to the message or messages painted on the street's surface.

All of the above illustrates the perils of conducting a public forum analysis prematurely, in the absence of a fully developed factual record.  *Stewart*, 863 F.2d at 1017-18.  Regardless, Plaintiff's complaint alleged no facts from which it can be concluded that District streets in general and 16th Street in particular are anything but public forums.  And if there were any doubt about 16th Street's forum status, the painting of both "Black Lives Matter and "Defund the Police," the Mayor's description of 16th Street as "a place for healing, strategizing, protest, and redress," and the fact that the public has put the street to any number of uses, including yoga classes and movie screenings, makes clear that it is a public forum.[14]

---

[13]    A "Black Lives Matter" message was painted on 5th Avenue in New York City, and the street remains open to vehicular traffic.  *See https://abc7ny.com/trump-tower-black-lives-matter-mural-vandalized-red-paint-in-nyc/6315320/.*

[14]    Importantly, even if the Court were to conclude that "Black Lives Matter" and "Defund

D.      Government Regulation and Viewpoint Discrimination.

In a typical First Amendment case, the final step in the analysis requires looking at the government's regulation of speech in the type of forum at issue to see if it passes constitutional muster.  *Mahoney*, 642 F.3d at 1116.  For a traditional public forum or designated or limited public forum, the test is the same:  the government's ability to restrict speech is limited to the enforcement of time, place, and manner regulations, provided the restrictions are content neutral, narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.  *Id.* at 1117.  For a non-public forum, the government may not discriminate on the basis of the content of speech – viewpoint discrimination – to the extent it allows speech.  *Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*, 901 F.3d 356, 365 (D.C. Cir. 2018) (*citing Cornelius*, 473 U.S. at 806).

The Supreme Court has made clear that "[a] government regulation that allows arbitrary application is 'inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view.'"  *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 130-131 (1992) (*quoting Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 649 (1981)).  "To curtail that risk, 'a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license' must contain 'narrow, objective, and definite standards to guide the licensing authority."  *Id.* at

---

the Police" are government speech, Defendants would still have violated Plaintiff's First Amendment rights.  *See Walker*, 576 U.S. at 219.  The existence of the two messages on 16th Street merely narrows the portion of the public forum that may be used by others.  It does not terminate the street's status as a public forum in its entirety.  *See A.N.S.W.E.R. Coal.*, 153 F. Supp.3d at 413-414 (Although the government's speech "itself is not subject to First Amendment scrutiny, the restriction of the expressive activities of [the plaintiff] and all other private persons and entities to limited portions of the parade route and Freedom Plaza *is*.").  Since "Defund the Police" has been removed and the street remains closed to traffic, a greater portion of the street is now available for Plaintiff's message as well as the message of any other group or individual.

131 (*quoting Shuttlesworth v. Birmingham*, 394 U.S. 147, 150-51 (1969)).  Accordingly, narrowly drawn, reasonable, and definite standards must guide the hands of government administrators charged with allowing the exercise of First Amendment rights.  *Id.* at 133.  The First Amendment, the Court found, prohibits the vesting of unbridled discretion in government officials.  *Id.*

Here, Defendants admit there is no regulatory process for requesting permission to paint an expressive message on a District street.  Defs' Mot. at 4 ("no such permit exists").  They do not and cannot deny that the District's anti-defacement statute criminalizes writing or marking on the District's streets without the District's consent.  *See* D.C. Code § 22-3312.01.  Indeed, *Mahoney*, which Defendants themselves cite (Defs' Mot. at 20), upheld the constitutionality of the statute in the context of chalking expressive messages on the street in front of the White House.  The statute is a clear prior restraint that conditions a speech on approval of the government.  Given the absence of any process for requesting permission to paint an expressive message on a District street and the prior restraint of the anti-defacement statute, the well-pled allegations of the complaint make it at least plausible that Plaintiff's First Amendment rights were violated by inherently arbitrary government action.

Specifically, one group painted "Black Lives Matter" on 16th Street and enjoyed the approval and support of the Mayor.  Another changed the first group's message by adding "Defund the Police" to "Black Lives Matter," but without requesting or obtaining permission from the District and in direct violation of the District's anti-defacement law.  The second group's conduct was plainly unlawful and they could have been arrested for it, yet no action was taken against them and their message remained on 16th Street for nearly ten weeks.  By contrast, Plaintiff reached out to multiple District officials seeking permission and guidance on painting

its message.  Plaintiff could not have been more accommodating and flexible, yet their request

was essentially ignored.  Plaintiff has since learned that a veterans organization seeking to paint

"Veterans Lives Matter" on a District street was provided two alternate processes to follow

despite Defendants' representation to Plaintiff that no process existed.  Plaintiff also has since

learned that members of a pro-life group were arrested for writing "Pre-Born Black Lives

Matter" in chalk on a District sidewalk.  The group claimed they were granted a permit from the

MPD and were told they would not be prevented from writing their message on the street.  On

the morning of their protest, police told them they would not be allowed to paint on the street,

and when they instead started to chalk their message on the sidewalk, they were arrested for

allegedly violating the District's anti-defacement statute.[15]

These same factual allegations also demonstrate that Plaintiff can at least plausibly allege

its First Amendment rights were violated by viewpoint discrimination.  "Viewpoint

discrimination is [] an egregious form of content discrimination."  *Rosenberger v. Rector &*

*Visitors of the Univ. of Virginia*, 515 U.S. 819, 829 (1995).  Because of this, viewpoint

discrimination is prohibited regardless of the type of forum.  *See id*; *see also Norse v. City of*

*Santa Cruz,* 629 F.3d 966, 979 (9th Cir. 2010) (Kozinski, J., concurring) ("[T]he government

may never suppress viewpoints it doesn't like.");  *Child Evangelism Fellowship of S.C. v.*

---

[15]     Given the prior restraint posed by the District's anti-defacement statute, the lack of a
timely response to Plaintiff's request further demonstrates the inherent arbitrariness of
Defendants' actions.  As the Supreme Court has made clear, even a day or two delay may be
detrimental to First Amendment expression.  *See Carroll*, 393 U.S. at 182.  The DC Circuit held
in *Boardley v U.S. Dep't of the Interior*, 615 F.3d 508, 518 (D.C. Cir. 2010) that even an
"without unreasonable delay" standard gave permitting officials sufficient guidance for issuing
permits for expressive activity.  As Defendants have admitted there is no permitting process here,
they also have conceded that not even an "without unreasonable delay" standard governed their
response to Plaintiff's request.  The result was a further, plausible violation of Plaintiff's First
Amendment rights, as to date Defendants have never responded substantively to Plaintiff's
request.

*Anderson Sch. Dist. Five*, 470 F.3d 1062 (4th Cir. 2006) ("The ban on viewpoint discrimination is a constant."). The analysis remains the same if the Court determines District streets are traditional public fora, designated public fora, or nonpublic fora.

Most relevant to any determination as to whether viewpoint discrimination has occurred is "a lack of evenhandedness in the Government's actions." *Am. Freedom Def. Initiative*, 901 F.3d at 366. Or, "where the government states that it rejects something because of a certain characteristic, but other things possessing the same characteristic are accepted, this sort of under inclusiveness raises a suspicion that the stated neutral ground for action is meant to shield an impermissible motive." *Ridley v. Massachusetts Bay Transp. Auth.*, 390 F.3d 65, 87 (1st Cir. 2004). Comparing the treatment of the various groups that either painted an expressive message on a District street or sought do so clearly shows that Defendants are not acting evenhandedly. Although each group wanted to paint an expressive message, each was treated differently. These differences alone are sufficient to defeat a motion to dismiss on the viewpoint discrimination claim. Defendants' entire argument as to why Plaintiff cannot establish viewpoint discrimination boils down to nothing more than the assertions that they have "not granted a permit to any other individual or entity for purposes of painting a street mural" nor "provided the opportunity for any members of the public" to paint their own message. Defs' Mot. at 25. Such assertions are contrary to the factual allegations in the Complaint and events that have transpired since the Complaint was filed. Plaintiff has or at least can plead facts showing that it was denied the opportunity to paint its expressive message because of its viewpoint.

E.    Plaintiff Did Not Bring A Municipal Liability Claim.

Defendants make the incongruous claim that Plaintiff must plead the existence of an official "policy or custom" under *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978) to be awarded prospective relief in their official capacity claims against Defendants. But Plaintiff did

not sue the District and does not seek damages from the District or Defendants.  Plaintiff also does not seek prospective relief against the District.  Plaintiff only seeks prospective relief against Defendants.

Defendants confuse a Section 1983 claim against a municipality with a Section 1983 claim against a municipality's officers or employees.  Only the former requires a "policy or custom."  *Monell*, 436 U.S. at 694.  This is because, while the Court in *Monell* found that municipalities were "persons" under Section 1983, it also found municipalities can only be held liable for their own constitutional wrongs, not the constitutional wrongs committed by individual officers or employees.  *Id.*  Put differently, Section 1983 does not provide liability against municipalities under a *respondeat superior* theory.  *Id.* at 691.  Something more is required:  an official policy or custom.  *Id.* at 694.  Because policies and customs are the official acts of a municipality, not the acts of individual municipal officers or employees, municipalities can be held liable under Section 1983 for policies and customs that violate the constitution.  *Id.*  In *Los Angeles Cnty. v. Humphries*, 562 U.S. 29 (2010), the Court confirmed that this principle applies to claims for prospective relief as well as claims for damages.

Obviously, municipal officers and employees are natural "persons," not legal constructs like municipalities.  There is no question that they can commit their own constitutional wrongs regardless of whether they act pursuant to an official policy or custom.  And while official capacity actions against individual officers and employees, when sued for damages under Section 1983, are treated as suits against the governmental entity they serve, official capacity actions for injunctive relief are treated differently.  They are not treated as actions against the government.  *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71, n.10 (1989); *Hedgepeth v. Wash. Metro. Area Transit Auth.*, 386 F.3d 1148, 1152, n.3 (D.C. Cir. 2004)

(allowing Section 1983 claim for injunctive relief against Metro official sued in his official capacity). Citing both *Will* and *Hedgepeth*, the Court in *Steinberg v. Gray*, 815 F. Supp.2d 293, 298 (D.D.C. 2011), allowed official capacity claims for injunctive relief to proceed against District officials but held that official capacity damages claims against those same officials were no different than a damages claim against the District itself.[16] Only the latter required an official policy or custom.

In sum, two inquiries are relevant in analyzing whether a Section 1983 action against a municipal officer or employee requires an official policy or custom: whether the action seeks damages or only prospective relief and whether the action is brought in an individual or official capacity. No policy or custom is required for an official capacity action seeking only injunctive relief against a municipal official or employee. *Will*, 491 U.S. at 71, n.10; *Hedgepeth*, 386 F.3d at 1152, n.3; *Steinberg*, 815 F. Supp.2d at 298. That is the claim Plaintiff brought. Defendants' reliance on *Price v. Dist. of Columbia*, 545 F. Supp.2d 89 (D.D.C. 2008) is misplaced. *Price* was a damages action against the District and District officials in their official capacities. *See* Complaint, *Price v. Dist. of Columbia*, Case No. 07-0884 (RBW) (D.D.C.). Plaintiff has not brought any such claim.

## IV.   CONCLUSION.

For the foregoing reasons, Defendants' motion to dismiss must be denied and the case allowed to proceed to discovery and trial.

---

[16]    Official capacity damages claims against officers and employees are typically considered redundant of damages claims against the governmental entity and dismissed accordingly. *See Steinberg*, 815 F. Supp.2d at 298-99.

Dated:  August 21, 2020

Respectfully submitted,

*/s/ Paul J. Orfanedes*
Paul J. Orfanedes
DC Bar No. 429716

*/s/ Michael Bekesha*
Michael Bekesha
DC Bar No. 995749
JUDICIAL WATCH, INC.
425 Third Street SW, Suite 800
Washington, DC 20024
Tel:    (202) 646-5172
Fax:    (202) 646-5199
Email: porfanedes@judicialwatch.org
        mbekesha@judicialwatch.org

T. Russell Nobile*
JUDICIAL WATCH, INC.
Post Office Box 6592
Gulfport, Mississippi 39506
Tel:    (202) 527-9866
Email:  rnobile@judicialwatch.org

* Application for admission *pro hac vice*
  forthcoming

*Counsel for Plaintiff*