UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **JUDICIAL WATCH, INC,** | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No. 20-cv-1789 (TSC) |
| **MURIEL BOWSER,** *in her official capacity* *as Mayor of the District of Columbia, et al.,* | ) ) ) | |
| Defendants. | ) ) ) | |

### MEMORANDUM OPINION

Plaintiff Judicial Watch, Inc., a not-for-profit organization, has sued Defendants—D.C. Mayor Muriel Bowser, Interim Deputy Mayor John Falcicchio, and Director of Transportation Jeffrey Martoonian—alleging that they violated its First Amendment rights by denying its request to paint its organization's motto on city streets. Defendants have moved to dismiss Plaintiff's lawsuit, and, for the reasons explained below, the court will GRANT Defendants' motion to dismiss.

### I.   BACKGROUND

On June 5, 2020, in the wake of widespread protests surrounding the killing of George Floyd in Minneapolis, Minnesota, employees of MuralsDC and the D.C. Department of Public Works ("DPW") teamed up with local artists to paint the words "Black Lives Matter" and the D.C. flag ("BLM mural") on a two-block stretch of 16th Street, NW. ECF No. 1, Compl. ¶ 7, 10. The two-block stretch was closed to traffic and remained so when Plaintiff filed this lawsuit. *Id.* ¶ 13. Mayor Bowser approved the work, and the day after it was painted stated, "[t]here are people who are craving to be heard and to be seen and to have their humanity recognized. We

had the opportunity to send that message loud and clear on a very important street in our city." *Id.* ¶ 10.

On June 6, 2020, activists acting without the Mayor's permission painted the words "Defund the Police" on 16th Street directly next to the mural. *Id.* ¶ 8. They also altered the image of the D.C. flag by painting over the three stars in the D.C. flag crest. *Id.* ¶ 9. As a result, the mural appeared to state, "Black Lives Matter = Defund the Police." *Id.* The next day, DPW employees repainted the stars on the D.C. crest, but did not alter the "Defund the Police" text. *Id.* DPW employees announced that "the 'Defund the Police' message would not be removed." *Id.*

On June 10, 2020, Plaintiff sent a letter to the Mayor's office requesting permission to paint the words, "Because No One Is Above the Law!" on District streets, "preferably Independence Avenue SW, between 2nd and 4th Streets SW," using lettering "identical in size and color to the lettering used to paint 'Black Lives Matter' on 16th Street NW." *Id.* ¶ 11. On June 12, 2020, Deputy Mayor Falcicchio responded, referring Plaintiff to the D.C. Department of Transportation. *Id.* ¶ 13. He cautioned Plaintiff that it was unlikely that the Department of Transportation would grant the request because the paint would conflict with road markings. *Id.* Falcicchio subsequently directed Plaintiff to a portion of the District's webpage pertaining to public space permits. *Id.* ¶ 17.

On June 23, 2020, Plaintiff sent another letter to Falcicchio, complaining that the District was ignoring its request and that the District did not have a policy or procedure for it to request a permit to paint on city streets. *Id.* ¶ 19. Plaintiff alleges that the next day, it called the D.C. Department of Transportation and spoke with a "customer service representative" who said she was "not sure we have a permit" for painting murals on city streets. *Id.* ¶ 21.

One week later, Plaintiff filed this action, alleging that Defendants violated its First Amendment rights, under 42 U.S.C. section 1983, by denying it permission to paint its organization's motto on a public street.  *Id.* ¶ 27.  Plaintiff also argues that Defendants failed to "provide a reasonable basis for denying Plaintiff the timely opportunity to paint its expressive message on a district street."  *Id*.

Defendants contend that Plaintiff fails to state a valid claim for relief because the BLM mural is government speech and that the District is not required to convert city streets into private message boards.  *See* ECF No. 12.

## II.   LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) for failure to state a claim "tests the legal sufficiency of a complaint."  *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  A complaint should state a "short plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. of Civ. Proc. 8(a)(2).  The complaint must contain enough facts to state a claim that is plausible on its face by alleging facts that, if assumed to be true, would allow the court to draw "reasonable inference[s] that the defendant is liable for the misconduct alleged."  *Bell Atl. Co. v. Twombly*, 550 US 544, 555-56 (2007); *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015); *Ashcroft v. Iqbal*, 556 US 662, 677-78 (2009).  The court presumes the truth of a plaintiff's factual allegations, see *Iqbal*, 556 U.S. at 679, and construes the complaint "in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged," *Hettinga v. United States*, 677 F.3d 471 (D.C. Cir. 2012) (internal quotation marks omitted).  Moreover, when deciding on a motion to dismiss, the court "may consider . . . the facts alleged in the complaint, any documents either attached to or incorporated in the complaint, and matters of which [the Court] may take judicial notice."  *EEOC v. St. Francis Xavier Parochial*

*Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997); *Laughlin v. Holder*, 923 F.Supp.2d 204, 209 (D.D.C. 2013).

### III.     ANALYSIS

"It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995).  If the government creates a space for public speech, it "must respect the open character of" that space, *Oberwetter v. Hilliard*, 639 F. 3d 545, 551 (D.C. Cir. 2011), and not engage in "viewpoint discrimination," whereby the government favors or restricts certain speech based on the "motivating ideology or the opinion or perspective of the speaker," *Penkoski v. Bowser*, No. 20-CV-01519 (TNM), 2021 WL 2913132, at *5 (D.D.C. July 12, 2021) (citing *Rosenberger*, 515 U.S. at 829).

While the First Amendment restricts government regulation of private speech, "it does not regulate government speech." *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009).  A government entity may "speak for itself," and "select the views that it wants to express." *Id*. at 467-68.  For instance, the government "need not promote 'pro-littering' campaigns aside its anti-littering campaigns." *Penkoski*, 2021 WL 2913132 at *5 (citing *See Nat'l Endow. for Arts v. Finley*, 524 U.S. 569, 598 (1998) (Scalia, J., concurring in judgment) ("It is the very business of government to favor and disfavor points of view.")).  Indeed, "[e]ven political discrimination is allowed when the government chooses to sponsor speech." *Raven v. Sajet*, 334 F. Supp. 3d 22, 32 (D.D.C. 2018), *aff'd sub nom. Raven v. United States*, No. 18-5346, 2019 WL 2562945 (D.C. Cir. May 17, 2019).  "Were the Free Speech Clause interpreted otherwise, government would not work." *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015).

A. **Traditional Public Forum**

Defendants argue that public streets are not a traditional public forum for street paintings, and therefore they were not required to "respect the open character" of city streets by allowing Plaintiff to paint its preferred message. *Id.* The court agrees.

Plaintiff argues that public streets have long been recognized as a traditional public forum for "expressive activities" such as "street protests," and that the forum should be interpreted to also allow street paintings. Pl. Opp'n at 25. To be sure, public streets "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Summum*, 555 U.S. at 469. However, the Supreme Court's characterization of a public street as a place of assembly for temporary communications does not convert public streets into a forum for painting permanent messages on the street.

For example, in *Summum*, the Supreme Court rejected attempts to "analogize the installation of permanent monuments in a public park to the delivery of speeches and the holding of marches and demonstrations" and rejected the argument that public parks are a traditional public forum for the installation of monuments. *Id.* at 478. In so holding, the Court distinguished between expressions that are temporary—such as speakers who "eventually come to the end of their remarks" and people carrying signs who "at some point tire and go home"— and monuments that "monopolize the use of the land on which they stand and interfere permanently with other uses of the public space." *Id.* at 479. *See also Mahoney v. Doe*, 642 F.3d 1112, 1117, 1119 (D.C. Cir. 2011) (finding that chalk art qualified as speech in a public forum—a closed road akin to a sidewalk—when "the defacement at issue is temporary and can be cured"). The Court concluded that, "as a general matter, forum analysis simply does not

apply to the installation of permanent monuments on public property." *Summum*, 555 U.S. at 480.

Here, Plaintiff requested to paint the words "Because No One is Above the Law!" on a public road, "preferably Independence Avenue SW, between 2nd and 4th Streets SW," using lettering "identical in size and color to the lettering used to paint 'Black Lives Matter' on 16th Street NW." Compl. ¶ 11. Plaintiff's envisioned painting would thus "span[] the entire width of the street and cover[] nearly two blocks." *Id.* ¶ 7. It would be akin to erecting a permanent monument in a public park in that the painting would not "tire and go home" or fade or wash away like chalk. The Supreme Court's characterization of a public street as a place of assembly where citizens can communicate is "undeniably distinct from an endorsement of the use of the face of a street -- usually reserved for transportation-related guidance -- as a message board for private speech." *Women for Am. First v. de Blasio*, 520 F. Supp. 3d 532, 543 (S.D.N.Y. 2021) (internal citation omitted). This conclusion is further underscored by 18 DCMR § 2102.2, which prohibits the display of signs or markings that would hide or interfere with the effectiveness of traffic control devices.

Plaintiff's own allegations show that the District's streets have not historically been used to allow private street paintings. *See* Compl. ¶ 12 (alleging that Judicial Watch is "unable to identify or recall any similar use of District street surfaces for painting expressive messages"); *id.* ¶¶ 17-18 (alleging that the District's webpage for public space permits contains no information regarding how to request a permit for street painting); *id.* ¶ 19 ("We also have not been able to identify a policy or procedure for requesting a permit to paint a message on a street or a policy or procedure for closing a street to accommodate a street painting."); *id.* ¶ 21

(alleging that a "customer service representative" of the District Department of Transportation reported she had "never heard of" the Department issuing permits to paint city streets).

The Supreme Court "has rejected the view that traditional public forum status extends beyond its historic confines." *Walker*, 576 U.S. at 215 (citing *Arkansas Ed. Television Comm'n v. Forbes*, 523 U.S. 666, 678 (1998)).  Here, privately painted messages on public streets go beyond historic confines.  Accordingly, the court finds that Plaintiff has not alleged facts sufficient to show that Defendants restricted access to a traditional public forum by denying Plaintiff permission to paint on a public road.

### B. Designated or Limited Public Forum

In the alternative, Plaintiff argues that the District converted city streets into a designated or limited public forum for street paintings when it approved the painting of the BLM mural. Plaintiff contends that having done so, Defendants are now required to permit similar expression of different viewpoints absent a compelling reason for denial.

In *Walker*, the Supreme Court considered whether the state of Texas could permissibly restrict content that citizens displayed on specialty license plates. *Walker*, 576 U.S. at 203.  The parties agreed that specialty license plates were not a traditional public forum, but they disputed whether Texas converted specialty license plates into a designated or limited public forum by approving some requests to display private messages. *Id.* at 215-16.  The Court held that Texas's specialty plates "are neither a designated public forum, which exists where government property that has not traditionally been regarded as a public forum is intentionally opened up for that purpose, nor a limited public forum, which exists where a government has reserved a forum for certain groups or for the discussion of certain topics." *Id.* at 215 (cleaned up).  The Court explained that the government does not create a public forum—of any variety— "by inaction or

by permitting limited disclosure." *Id.* (internal citations and quotation marks omitted).  In addition, the government does not create a public forum when it engages in government speech on government property.  *Id.* (explaining that while courts engage in a "'forum analysis' to evaluate government restrictions on purely private speech that occurs on government property," the analysis does not apply to government speech).

The Court in *Walker* provided three factors for courts to consider when determining if a message is private or government speech: (1) whether the medium at issue has historically been used to communicate messages from the government, (2) whether the public reasonably interprets the government to be the speaker, and (3) whether the government maintains editorial control over the speech.  *Id.* at 216.  One court in this jurisdiction has already considered the BLM mural through the lens of the three *Walker* factors, and it found the mural to be government speech.  *See Penkoski*, 2021 WL 2913132, at *9.  This court considers the three *Walker* factors in this case and reaches the same conclusion.

  1. <u>Historical Medium</u>

While "not a prerequisite," courts "have recognized that a medium that has long communicated government messages is more likely to be government speech."  *Pulphus v. Ayers*, 249 F. Supp. 3d 238, 247-48 (D.D.C. 2017) (cleaned up).  As an initial matter, though, the court must define the "medium."  *Penkoski*, 2021 WL 2913132 at *9.

Defendants consider the relevant "medium" to be markings on public streets generally, and they argue that the government has historically used that medium—through traffic and safety markings—to communicate with the public.  Def. Mot. at 15.  Plaintiff argues that the court should define the medium more narrowly, as art murals on public streets, and that in this regard, the BLM mural was "unique" and the first of its kind.  Pl. Opp'n at 24.

The *Penkoski* court was faced with a similar question and ultimately defined the medium as "paintings on public streets." *Penkoski*, 2021 WL 2913132 at *7. *See also Pulphus*, 249 F. Supp. 3d at 248 (applying a "higher level of generality" to the historical analysis prong). This court agrees and adopts that same definition.

It is undisputed that the District has historically painted roads to communicate with the public. Double yellow lines convey the boundary between traffic moving in a different direction; arrows urge drivers to merge before their lane ends; and crosswalk markings communicate with both drivers and pedestrians to proceed with caution. Likewise, District street surfaces are not traditionally places where members of the public can display permanent or long-term messages. *See, e.g.*, 18 DCMR § 2102.2 (prohibiting anyone from displaying signs or markings that would hide or interfere with the effectiveness of traffic control devices).

On the other hand, Defendants offer no historical examples of the District painting similar murals on city streets, and traffic and safety instructions differ from the BLM mural in both purpose and design. *See Penkoski*, 2021 WL 2913132 at *7 (distinguishing traffic instructions directed at drivers and pedestrians from the BLM mural which is "perpendicular to traffic on the road or sidewalk"). Although these differences support Plaintiff's position, they are not necessarily determinative. *See Pulphus*, 249 F. Supp. 3d at 248-49 ("[T]he Supreme Court has not required that a medium convey a consistent or unified government message in order to constitute a 'traditional' medium for government speech."); *cf Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 803 (1985) (explaining that courts must not "infer that the government intended to create a public forum" simply because "the nature of the property is inconsistent with expressive activity").

Ultimately, this court, like the court in *Penkoski*, finds that the first *Walker* factor is inconclusive.

### 2. Reasonable Interpretation

The second *Walker* factor asks whether the public would reasonably interpret the government to be the speaker. This factor weighs heavily in favor of finding that the BLM mural is government speech.

City streets—like the public parks at issue in *Summum*, and the license plates in *Walker*—are often closely identified in the public mind with the government. *See Summum*, 555 U.S. at 472. The District government pays for street construction and repairs, *see* D.C. Code § 9–401, regulates First Amendment assemblies on public streets, *see generally* D.C. Code §§ 5–331.01–17, and enacts laws to enforce its legitimate interest in "ensuring public safety and order, promoting the free flow of traffic on streets and sidewalks, [and] protecting property rights," *Schenck v. Pro–Choice Network of Western N.Y.*, 519 U.S. 357, 376 (1997). A reasonable person would understand that it "is not common for property owners," including the government, "to open up their property [to messages] with which they do not wish to be associated." *Summum*, 555 U.S. at 471. Accordingly, "[e]ven if the government has not historically conveyed messages on the streets of the District in this way, the public would reasonably assume the government endorses messages that appear permanently painted on its streets." *Penkoski*, 2021 WL 2913132 at *8. *See also Pulphus*, 249 F. Supp. 3d at 249 (collecting cases) (explaining that art selected for display on public property is "often treated as being endorsed by the government or representative of the government's views, and is therefore considered government speech").

Plaintiff's own allegations further illustrate that a reasonable person would interpret the BLM mural to be government speech. On June 5, 2020, the day the BLM mural was painted, Mayor Bowser held a press conference and stated, "[t]here are people who are craving to be heard and to be seen and to have their humanity recognized. We had the opportunity to send that message loud and clear on a very important street in our city." Compl. ¶ 10. And it is not disputed that the District renamed the site of the mural "Black Lives Matter Plaza" and closed the painted section of 16th Street to traffic. *Id.* ¶¶ 13-15. Indeed, Plaintiff's own interpretation seems to be that the BLM mural was government speech. *See id.* ¶ 10 ("Mayor Bowser plainly approved and supports the painting of 'Black Lives Matter' on 16th Street and either approved or acquiesced in the painting of 'Defund the Police.'"); *id.* ¶ 11 (observing the same); *id.* ¶ 19 ("We have been unable to identify any particular reason why 16th Street remains closed other than to accommodate the two street paintings."). These alleged facts underscore that a reasonable person would interpret the BLM mural as government as government speech.

3. Editorial Control

While the second *Walker* factor deals with the degree to which the public perceives that the government exercises control over the BLM mural, the third factor deals with the degree to which the government actually exercises control over the mural.

Plaintiff alleges that the District has not maintained editorial control over the BLM mural because non-District employees contributed to painting the original mural, *id.* ¶ 7; Pls. Response to Mot. to Dismiss at 27, and because activists added the words "Defund the Police" to the mural and painted over the stars on the D.C. flag. Even assuming these facts to be true, they do not give rise to a valid First Amendment claim for three reasons.

First, the fact non-District employees assisted with the physical effort of painting the BLM mural is immaterial for First Amendment purposes. *Walker*, 576 U.S. at 217 ("The fact that private parties take part in the design and propagation of a message does not extinguish the governmental nature of the message or transform the government's role into that of a mere forum-provider."); *see also People for the Ethical Treatment of Animals, Inc. v. Gittens (PETA)*, 414 F.3d 23, 28 (D.C. Cir. 2005) ("compilation of the speech of third parties is a communicative act") (cleaned up).

Second, after activists painted over the stars in the D.C. flag and added the words "Defund the Police," District employees repainted part of the mural the next day, adding back the stars to the D.C. emblem. Compl. ¶ 9. "That temporary loss of control does not detract from the [BLM mural] as government speech; in fact, the District's quick movement to repaint the D.C. flag exhibits editorial control." *Penkoski*, 2021 WL 2913132, at *8. *Cf. Walker*, 576 U.S. at 213 (noting that "the State has rejected at least a dozen proposed designs" for the license plate when judging degree of editorial control).

Third, Plaintiff recognizes Defendants' affirmative decision to keep the "Defund the Police" addition as part of the mural. *See* Compl. ¶ 9 ("[T]he District Department of Public Works also announced that the 'Defund the Police' message would not be removed"). Plaintiff's allegation that Defendants decided to accept some changes to the mural, while rejecting others, demonstrates their editorial control. Consider the following examples. At public libraries, "the government speaks through its selection of which books to put on the shelves and which books to exclude." *PETA*, 414 F.3d at 28. When planning a parade, a government commission was free to make "arbitrary or viewpoint-based decisions about which donkeys and elephants it wanted in its parade." *Id.* And the Smithsonian Board of Regents has "expansive authority to accept a

portrait 'on the basis of its general historical interest, its artistic merit, or the historical significance of the individual to which it relates, or any combination of any such factors.'" *Raven*, 334 F. Supp. 3d at 32, *aff'd sub nom.* 2019 WL 2562945.  Plaintiff appears to allege that the BLM mural "appears as the Mayor wants it to appear, communicating a political message from the District." *Penkoski*, 2021 WL 2913132, at *9.  *See also Summum*, 555 U.S. at 467 (the government may "select the views it wants to express").  Thus, this factor, like the previous one, supports a finding that the BLM mural is government speech.

Because the weight of the *Walker* factors compels a finding that the BLM mural is government speech, Plaintiff fails to state a valid claim that Defendants created a public forum or impermissibly denied them access to that forum.

### C.  Forum Analysis Is Inapposite

Having found that the BLM mural is government speech, the court concludes that a public forum analysis, and the accompanying judicial scrutiny, does not apply.  *See Walker*, 576 U.S. at 215 (forum analysis is "misplaced" where the government is speaking on its own behalf); *Summum*, 555 U.S. at 480 ("[F]orum analysis simply does not apply to the installation of permanent monuments on public property."); *PETA*, 414 F.3d at 29.  "The curator of a stateowned museum, for example, may decide to display only busts of Union Army generals of the Civil War, or the curator may decide to exhibit only busts of Confederate generals. The First Amendment has nothing to do with such choices."  *Id.* at 28.

Therefore, even were the court to credit Plaintiff's vague and conclusory allegation that Defendants denied its application without a "reasonable basis" and did so relying on "reasonable, non-arbitrary processes and procedures," Compl. ¶ 27, that would not establish a valid claim for relief.  *See Cornelius*, 473 U.S. at 799-800 ("Nothing in the Constitution requires the

Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities."); *PETA*, 414 F.3d at 30 ("[W]e can see no First Amendment problem with the Commission making arbitrary or viewpoint-based decisions about which donkeys and elephants it wanted in its parade. No one could plausibly argue that an Inauguration Parade has to have balance, or that the losing Presidential candidate must—if he requests—be allowed to have a float of his own."). Plaintiff may consider Defendants' actions arbitrary and inappropriate, but Plaintiff has not alleged sufficient facts to show that in this case the First Amendment requires the government to permit private parties to paint on public streets.

### D. Motion to Dismiss

Plaintiff finally argues that the court lacks sufficient factual evidence to conclude that the BLM mural is government speech. It relies on *Stewart v. D.C. Armory Bd.*, 863 F.2d 1013 (D.C. Cir. 1988), which held that the question of whether a sports stadium on government property served as a public forum was "inherently a factual" question that should not have been decided by the court as a matter of law. Plaintiff's reliance on *Stewart* is misplaced.

The inquiry in *Stewart*—whether the government was hosting a public or nonpublic forum—is not the question here. Because the court has found that the BLM mural was government speech, "forum analysis does not apply." *Pulphus*, 249 F. Supp. 3d at 247.

In any event, contrary to Plaintiff's suggestion, *Stewart* did not announce a bright-line rule that public forum questions cannot be addressed at the motion to dismiss stage; rather, the court's decision was limited to the specifics of the case. *See Stewart*, 863 F.2d at 1014 ("We conclude that *the question of whether RFK Stadium is a public forum* is inherently a factual one.") (emphasis added); *id.* at 1018 ("We conclude that identifying the government's intent *in*

*this case* raises inherently factual issues) (same).  Courts have since granted motions to dismiss involving similar questions where the specific facts of those cases permitted.  *See Raven*, 334 F. Supp. 3d at 22, *aff'd sub nom.* 2019 WL 2562945 (granting motion to dismiss plaintiff's complaint for failure to state a First Amendment violation because the government's selection of artwork constituted government speech).

Finally, in *Stewart*, the D.C. Circuit held that the district court erred in relying on "inferences drawn by the court" that, "even if true, [were] not sufficient to defeat" the plaintiff's factual allegations.  *Id.* at 1018.  Unlike the district court in *Stewart*, this court has not drawn its own inferences to counter or rebut Plaintiff's allegations.  As previously explained, at each turn in this case, the court has credited Plaintiff's allegations.  Ultimately, however, those allegations must establish a viable claim for relief.  *Twombly*, 550 US 544, 555-56.  Here, they do not.

## IV.    CONCLUSION

For reasons explained above, the court will GRANT Defendants' motion to dismiss.

Date:  February 7, 2022

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge